FILED

NOV 1 5 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT

District of Columbia

GEORGE MAY,
*POB 32247*
*PALM BEACH GARDENS, FLA. 33420*
PLAINTIFF,
*305, 508, 9011*

v.

THE STATE OF FLORIDA, RIC
L. BRADSHAW, INDIVIDUALLY,
ELIZABETH T. MAASS,
INDIVIDUALLY, JEFFREY A.
WINIKOFF, INDIVIDUALLY,
JOINTLY, AND SEVERALLY,

DEFENDANT'S

NO. _____

Case: 1:07-cv-02096
Assigned To : Collyer, Rosemary M.
Assign. Date : 11/15/2007
Description: Pro Se General Civil

## COMPLAINT

COMES NOW PLAINTIFF, George May, and does hereby file this his complaint, complaint for injunction against the defendant's, the State of Florida, Ric L. Bradshaw, individually, Elizabeth T. Maass, individually, Jeffrey A. Winikoff, individually for the deprivation of his First, Fourth, Fifth, Fourteenth, Amendment of the United States of America Constitution Rights, his Civil Rights, Liberty, Due Process Rights, by a "transparently" unlawful invalid decree, arrest warrant, unconstitutional on it's face, patently unconstitutional, as applied, invalid contempt of court order, arrest warrant, unconstitutional as applied State Statute, §68.093, and as grounds therefore demands damages, and injunction against the State of Florida, Ric L. Bradshaw individually, Elizabeth T. Maass, individually, Jeffrey A. Winikoff, individually, for cause herein as follows:

-1-

1. The plaintiff, George May, is a natural born citizen of the United States of America, a resident of the State of Florida, domiciled in Florida.

2. The defendant, the State of Florida is a political subdivision of the United States of America.

3. The defendant Ric L. Bradshaw, is the current sheriff of Palm Beach County, Florida, a resident of the State of Florida, domiciled in West Palm Beach, Florida

4. The defendant, Elizabeth T. Maass, is a circuit court judge in West Palm Beach, Florida a resident of the State of Florida, domiciled in Florida.

5. The defendant Jeffrey A. Winikoff, is a circuit court judge in West Palm Beach, Florida a resident of the State of Florida, domiciled in West Palm Beach, Florida.

6. The amount in controversy in this matter exceeds $75,000.00, bringing it within the purview of this honorable court.

## JURISDICTION

7. The plaintiff, George May here realleges, and reaffirms his allegations in 1. through 7. and incorporates them herein.

8. This honorable court has jurisdiction over this matter under the First, Fourth, Fifth, Fourteenth, Amendment of the United States of America Constitution, the Civil Rights AcT, the Due Process Clause, the Bill of Rights.

## STATEMENT OF THE CASE
### COUNT I

9. The plaintiff, George May here realleges, and reaffirms his allegations in 1. through 9. and incorporates them herein.

-2-

10. The plaintiff, George May is the "Title Owner", "Owner of Identity of Title" to his English Common Law Inventions, Trade Secrets, Business Plans, Business Methods, Articles, Drawings, Schematics, Data, **Business Code**, Design, **WTO Invention, Collateral Know-How, for:** his Pyramid Hotel with a light at the top, hotel Casino Theme Park A/K/A Luxor, his Interactive Gambling Machine with Wheels that pays a Random Incentive Bonus, A/K/A The Wheel of Gold, his use of the Star Trek Series as a Theme for a Theme Park A/K/A the experience at the Las Vegas Hilton, here attached is plaintiff, George May addendum "A".

11. The State of Florida, Ric L. Bradshaw, individually, Elizabeth T. Maass, individually, Jeffrey A. Winikoff, individually, are depriving, violating, the plaintiff, George May, First, Fourth, Fifth, Fourteenth Amendment of the United States of America Constitution, his Civil Rights, his Due Process Rights, his right to payment on his contracts, Liberty, payment for his English Common Law Inventions, Trade Secrets, Articles, Business Plans, Business Methods, Drawings, Schematics, Data, Technology, **Business Code**, WTO Invention, **Design** before mentioned herein by enforcing the invalid, void, unconstitutional, without subject matter jurisdiction, unconstitutional as applied order for contempt of Court, arrest warrant, entered by Elizabeth T. Maass, on January 19, 2005, in Case No. 502004CA004938XXXXMB, Jeffrey A. Winikoff, October 14, 2004, Case No Ca 04 8739 AN. Circuit Court Palm Beach County, Florida.

12. The plaintiff, George May, Constitutional Rights, Civil Rights, Due Process Rights, Liberty, property, before mentioned herein have been robbed by the defendant's the State of Florida

Ric L. Bradshaw, individually, Elizabeth T. Maass, individually,
Jeffrey A. Winikoff, individually, by the use of a unlawful,
unconstitutional, invalid, "DEVICE", of a "transparently"
unlawful, invalid contempt of court order, arrest warrant,
unconstitutional invalid, "transparently" unlawful, contempt
of court order, arrest warrant. Walker v. City of Birmingham
388 U.S. 307, 315 (1967); ExParte Young Supra;, Scheuer v.
Rhodes, 94 S. Ct. 1683, and unconstitutional on it's face,
patently unconstitutional as applied State Statute §68.093,
failure to comply with Rule 3.840, Baker v. Green, 732 So. 2d
6 (Fla 4th DCA 1999); no "State" shall deprive any person of
"Liberty" without due process of law. Shelly v. Kraemer, 334
U.S. 1, 14-18, attached here is plaintiff, George May addendum "B".

13. A court does not have jurisdiction to do what a city
or other agency of a state, state lacks jurisdiction to do.
The command of the Fourteenth Amendment through the First, Fourth,
Fifth, Amendment is made applicable to the States, is that no
"State" shall deprive any person of "liberty" without due process
of law. The decree of the State Court is "state" action in the
constitutional sense (Shelley v. Kraemer, 334 U.S. 1, 14-18), as
much as the action of the state police, the state prosecuter, the
state legislature, or the Governor himself. The Orders mentioned
herein are unconstitutional on their face, unconstitutional as
applied, The Statute §68.093, mentioned herein is unconstitutional
on it's face, unconstitutional, as applied, attached here is
plaintiff, George May addendum "C".

-4-

14. The defendant's here have denied plaintiff, George May

equal protection of the law and have invidious discriminated

against plaintiff, George May, because of his race. The defendant's

here are engaged RICO Acts by participating in a scheme to evade

I.R.S. tax, <u>United States v. Frumento, 563 F.2d 1083 (3rd Cir.</u>

<u>1977)</u>. The defendant's here have deprived, violated the Plaintiff,

George May, protected Due Process Rights, of the Fifth, Fourteenth

Amendment to the United States of America Constitution, his Civil

Rights, 42 U.S.C. § 1983, <u>Cohens v. Virginia, 19 U.S. (6 Wheat)</u>

<u>264, 404, 5 L. Ed. 257 (1821)</u>, by not obeying their "Oath"

contract, not obeying Rule 3.80 of the Florida Rules of Criminal

<u>Procedure. Brandon v. Holt, 469 U.S. 464 (1984)</u>.

15. The defendant's here have denied plaintiff, George May,

equal protection of the law and have invidious discriminated

against plaintiff, George May, because of taking payoffs from

the Isle of Capri Casino, Pompano Park Racing and Poker,

attached here is plaintiff, George May, addendum "B"

16. The defendant's here are committing treason by using

a State Statute that is unconstitutional, unconstitutional as

applied for the purpose of taking the plaintiff, George May

property, Intellectual property without due process of law,

required by the Fith, Fourteenth Amendment of the United States

of America Constitution. <u>Cooper v. Aaron, 358 U.S. 1, 78 S. Ct.</u>

<u>1401 (1958). U.S. v. Will, 449 U.S. 200, 216, 101 S. Ct. 471.</u>

17. The defendant's here have deprived plaintiff, George May

of his protected due process rights, by taking property without

due process of law required by the Fifth, Fourteenth Amendment

of the United States of America Constitution by setting up

their own "<u>Dictatorship</u>" within the United States of America

-5-

by enforcing a unconstitutional, unconstitutional as applied
contempt of court order, order for arrest of plaintiff, George
May, an unconstitutional, unconstitutional as applied State
Statute, 68.093, and an unconstitutional, unconstitutional as
applied State of Florida Constitutional Amendment 4, Article
X, SECTION 19, SLOT MACHINES, for the purpose of Racketeering,
deprivation, unequal administration of treaty's of the United
States, unjust and illegal discrimination between plaintiff,
George May, and persons in similar circumstances, as Henry
Flagler, Hard Rock founder Peter Morton,

18. The plaintiff, George May is suing these individuals
which are part of a conspiracy committing criminal acts, against
plaintiff, George May in their individual capacity, for their
actions clearly beyond the powers of their official positions
as state employees.

19. The plaintiff, George May, complaint here seeks to
prohibit the continued violation of plaintiff, George May,
Due Process Rights, Civil Rights, Due Process Provisions of
the Fifth, Fourteenth Amendment of the United States of America
Constitution by the defendant's for their self profit,
Honest Services Fraud, Money Laundering, I.R.S. Fraud,

20. The plaintiff, George May has established that the
defendant's are violating his Due Process Rights, provisions
of the Fifth, Fourteenth Amendment United States of America
Constitution by not obeying Rule 3.80 of the Florida Rules
of Criminal Procedure, not setting aside the invalid,
"transparently" unlawful decree, unconstitutional on it's face,
unconstitutional as applied, attached here is plaintiff, George
May, addendum "C", invalid contempt of court, arrest warrant.

-6-

21. This action seeks to enjoin the unconstitutional exercise deprivation, violation of plaintiff, George may, rights, privileges, and immunities under the United States of America Constitution, as amended, the Takings, Equal Protection and Due Process Clauses in the Fifth and Fourteenth Amendments,

WHEREFORE, plaintiff, George May, demands damages for the violation of his Civil Rights, 42 U.S.C. § 1983, Due Process Rights, in the First, Fourt, Fifth, Fourteenth Amendment United States of America Constitution against the defendant's Ric L. Bradshaw, individually, Elizabeth T. Maass, individually, Jeffrey A. Winikoff, individually, an Order enjoining the State of Florida, Ric L. Bradshaw, Sheriff of Palm Beach County from enforcing the invalid "transparently" unlawful contempt of Court order, arrest warrant issued by Elizabeth Maass, on January 19, 2005, in Case Number 502004CA004938MB Circuit Court of Palm Beach County, Florida, and an Order enjoining Elizabeth T. Maass, in Case Number 502004CA004938MB, Jeffrey A. Winikoff, in Case Number CA 04 8739 AN from not performing their required administrative duty of entering default, summary judgement for plaintiff, George May, and against the defendant's in Case Number 502004CA004938MB, Case Number CA 04 8739 AN, Circuit Court of Palm Beach County, Florida in the amount requested in plaintiff, George May, complaint's.

Respectfully submitted

George May
P.O. Box 32247
Palm Bch. Gardens
Fl. 33420
Ph. 305-508-5011

-7-

PLAINTIFF, GEORGE MAY

ADDENDUM

"A"


International Game Technology

December 3, 1993

Mr. George May
P.O. Box 32247
Palm Beach Gardens, FL 33420

Re:    Invention    ⟵

Dear Mr. May,

I have received your letter to Chuck Mathewson dated, October 30, 1993. At this time, IGT is not interested in using the concept as set forth in your letter.

Thank you for your interest in IGT.

Sincerely,

Stephen W. Morro
V.P., Marketing

SWM/vh

cc:  Chuck Mathewson

07 2096
**FILED**
NOV 1 5 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT



Mr. George Hey
P.O. Box 31247
Palm Beach Gardens, FL   33420

International Game Technology
P.O. Box 10580, Reno, NV 89510-0580

# CIRCUS CIRCUS
## ENTERPRISES, INC.



MICHAEL D. RUMBOLZ
DIRECTOR
CORPORATE DEVELOPMENT

December 29, 1993

Mr. George May
P.O. Box 32247
P. B. G., Florida  33420

Re:  Letters

Dear Mr. May:

We are in receipt of your unsolicited letters dated October 23, 1993 and December 5, 1993, proposing certain ventures with our company.

Please be advised that we are not interested in pursuing any business relationship with you. We also request that you not send us any further letters or proposals.  We do not accept any unsolicited information in confidence or with any restrictions as to our use of the information.  Should you send us any information in the future despite our request that you not do so, you are hereby notified that such information will be regarded as non-confidential and un-restricted despite any contrary legends that may appear on the material

Very truly yours,

Michael D. Rumbolz
Director of Corporate Development

MDR:cg



$0.24

U.S. POSTAGE

M8 3008

Mr. George Ivey
P.O. Box 33247
P. B. G., Florida 33420



CIRCUS CIRCUS
INTERPRISES, INC.
P.O. BOX 14967, LAS VEGAS, NEVADA 89114-4967

33420-3247



November 21, 1995

Mr. George May
P.O. Box 32247
Palm Beach Gardens, FL  33420

Dear Mr. May:

Your proposal for a Star Trek theme park has been forwarded to us by
Thomas Byrne of Blockbuster Entertainment Group.

While we find your proposal very interesting, we regret to inform you that
we are not pursuing this type of joint venture at the present time.  We thank
you for your interest and wish the best of luck in your endeavor.

Sincerely,

*Jane Cooper*

Jane Cooper
President & CEO

JC:amw

 **International Game Technology**

*Contract for payment to George May*

*Invention trade secret business plan business method identity of title owned by George May*

December 3, 1993

Mr. George May
P.O. Box 32247
Palm Beach Gardens, FL 33420

Re:    Invention ←

Dear Mr. May,

I have received your letter to Chuck Mathewson dated, October 30, 1993. At this tim
IGT is not interested in using the concept as set forth in your letter.

Thank you for your interest in IGT.

Sincerely,

Stephen W. Morro
V.P., Marketing

SWM/vh

cc:  Chuck Mathewson

*Signed letter pleading guilty to the commercial theft of trade secrets owned by George May*



DEC 5 95

Mr. George May
P.O. Box 32247
Palm Beach Gardens, FL  33420

334206-2242



International Game Technology

P.O. Box 10580, Reno, NV 89510-0580

# CIRCUS CIRCUS
## ENTERPRISES, INC.



MICHAEL D. RUMBOLZ
DIRECTOR
CORPORATE DEVELOPMENT

*[handwritten: INVENTION TRADE SECRET BUSINESS PLAN, BUSINESS METHOD IDENTITY OF TITLE OWNED BY GEORGE MAY]*

December 29, 1993

Mr. George May
P.O. Box 32247
P. B. G., Florida 33420

Re: Letters

Dear Mr. May:

We are in receipt of your unsolicited letters dated October 23, 1993 and December 5, 1993, proposing certain ventures with our company.

Please be advised that we are not interested in pursuing any business relationship with you. We also request that you not send us any further letters or proposals. We do not accept any unsolicited information in confidence or with any restrictions as to our use of the information. Should you send us any information in the future despite our request that you not do so, you are hereby notified that such information will be regarded as non-confidential and un-restricted despite any contrary legends that may appear on the material

Very truly yours,

*[signature]*

Michael D. Rumbolz
Director of Corporate Development

MDR:cs

*[handwritten: CONTRACT FOR PAYMENT TO GEORGE MAY]*

*[handwritten: SIGNED LETTER PLEADING GUILTY TO THE COMMERCIAL THEFT OF TRADE SECRETS OWNED BY GEORGE MAY]*



= 0.248

U.S. POSTAGE

DEC 8 9703

Mr. George May
P.O. Box 32247
P. B. G., Florida  33420

CIRCUS CIRCUS
ENTERPRISES, INC.

P.O. BOX 14967, LAS VEGAS, NEVADA 89114-4967

33420-2247



*Paramount Parks*

A  V I A C O M  C O M P A N Y

November 21, 1995

Mr. George May
P.O. Box 32247
Palm Beach Gardens, FL  33420

Dear Mr. May:

Your proposal for a Star Trek theme park has been forwarded to us by
Thomas Byrne of Blockbuster Entertainment Group.

While we find your proposal very interesting, we regret to inform you that
we are not pursuing this type of joint venture at the present time.  We thank
you for your interest and wish the best of luck in your endeavor.

Sincerely,

Jane Cooper
Jane Cooper
President & CEO

JC:amw

*[Handwritten:] Contract for payment to George May*

*[Handwritten:] George May trade secrets contained in his letter, plans*

TIT Symposium
IP Management Strategies
Tokyo
December 2, 2003

# INTELLECTUAL PROPERTY MANAGEMENT STRATEGIES IN U.S. CORPORATIONS

I.     <u>Introduction</u>

This is a "golden age" for Intellectual Property Rights (IPRs). Bill Gates speaks of a new "Gold Rush." More than ever companies are built around patented technology. "Innovate or perish" is the motto. Patent filings and issuances are skyrocketing, so much so that there is talk of a patent "revolution," "explosion," "frenzy". In 2002 the USPTO issued almost 200,000 patents. Trademarks experience a similar boom.

The courts are pro-IPRs as is legislation; even the Antitrust Division of the U.S. Justice Department is pro-IPRs. In fact, courts read the riot act to infringers. <u>Billion dollar damages have been awarded.</u> Treble damages, once rare, are now the order of the day. Injunctions are normal and not even stayed during appeals. Thus, patents now are more enforceable and it no longer pays to infringe as in the 60's and 70's when, in the unlikely event the patent in suit was upheld, only reasonably-royalty damages were assessed.

"Everything under the sun made by man" is patentable according to our Supreme Court. As of 1998, formerly unpatentable business methods and computer programs (algorithms) are now also patentable. General Electric filed over 400 patent applications on business methods in 2000. Banks are establishing patent departments.

Royalties obtained for licensing IPRs have exceeded the billion dollar mark for companies such as TI, IBM ($1.8 billion) and over $100 billion for all U.S. industries. Hence, IPRs are most valuable corporate assets or crown jewels.

And universities, not to be left out, have jumped on the bandwagon and by now are living in a "golden age" of their own for technology transfer.

According to the most recent Annual Survey of the Association of University Technology Managers (AUTM), universities reported for 2001 receiving 13,569 invention disclosures, filing 6,812 new U.S. patent applications and obtaining 3,721 U.S. patents.

Furthermore, 4,058 new licenses and options were executed and 22,937 licenses and options were active in 2001. Product sales were reported from 22% of these active agreements and 9,707 licenses and options yielded income, amounting to $1.071 billion. Ninety-five institutions indicated that no fewer than 358 new products were commercialized under license agreements with corporate partners and since 1998 a total of 1,507 new products were introduced to the market place by 164 universities. Examples of significant licenses are: Gene Splicing — Cohen-Boyer (Stanford), Cisplatin

General Electric's industrial diamond process technology and the Pizza Hut Decision, described below.

## VII.    Complementariness of Patents & Trade Secrets

Patents are but the tips of icebergs in an ocean of trade secrets. Over 90% of all new technology is covered by trade secrets and over 80% of all license and technology transfer agreements cover proprietary know-how, i.e. trade secrets, or constitute hybrid agreements relating to patents and trade secrets. As a practical matter, licenses under patents without access to associated or collateral know-how are often not good enough for commercial use of the patented technology. Bob Sherwood calls trade secrets the "work horse of technology transfer."

In this regard, let me cite the following persuasive comments:
"In many cases, particularly in chemical technology, the know-how is the most important part of a technology transfer agreement." (Homer Blair)
"Acquire not just the patents but the rights to the know-how. Access to experts and records, lab notebooks, and reports on pilot-scale operations, including data on markets and potential users of the technology are crucial." (Robert Ebish)
"Trade secrets are a component of almost every technology license…(and) can increase the value of a license up to 3 to 10 times the value of the deal if no trade secrets are involved." (Melvin Jager)
"It is common practice in industry to seek and obtain patents on that part of a technology that is amenable to patent protection, while maintaining related technological data and other information in confidence. Some regard a patent as little more than an advertisement for the sale of accompanying know-how." (Peter Rosenberg)
In technology licensing "(r)elated patent rights generally are mentioned late in the discussion and are perceived to have 'insignificant' value relative to the know-how." (Michael Ward, Honeywell VP Licensing)

Trade secrets are the first line defense: they come before patents, go with patents, and follow patents. Patents and trade secrets are not mutually exclusive but actually highly complementary and mutually reinforcing; in fact, they dovetail. Thus, it is clear that patents and trade secrets can not only coexist, but are in harmony rather than in conflict with each other. Indeed, they are inextricably intertwined, because the bulk of R&D data and results for any commercially important innovation cannot and need not be included in a patent application but deserve, and require, protection.

In the past — and even today — if trade secret maintenance was contemplated at all, e.g. for manufacturing process technology, which can be secreted unlike gadgets or machinery, which upon sale can be reverse-engineered, the question always was phrased in the alternative. E.g., titles of articles discussing the matter read "Trade Secret vs. Patent Protection", "To patent or not to patent?" "Trade Secret or Patent?" "To Patent or to Padlock?" etc.

PLAINTIFF, GEORGE MAY

ADDENDUM

"B"

Case 1:07-cv-02096-RMC   Document 1-2   Filed 11/15/2007   Page 5 of 66

Select Year:  [2006]  Go

## The 2006 Florida Statutes

Title XLVI
CRIMES

Chapter 812
THEFT, ROBBERY, AND RELATED CRIMES

View Entire Chapter

**812.081  Trade secrets; theft, embezzlement; unlawful copying; definitions; penalty.--**

(1)  As used in this section:

(a)  "Article" means any object, device, machine, material, substance, or composition of matter, or any mixture or copy thereof, whether in whole or in part, including any complete or partial writing, record, recording, drawing, sample, specimen, prototype model, photograph, microorganism, blueprint, map, or copy thereof.

(b)  "Representing" means completely or partially describing, depicting, embodying, containing, constituting, reflecting, or recording.

(c)  "Trade secret" means the whole or any portion or phase of any formula, pattern, device, combination of devices, or compilation of information which is for use, or is used, in the operation of a business and which provides the business an advantage, or an opportunity to obtain an advantage, over those who do not know or use it. "Trade secret" includes any scientific, technical, or commercial information, including any design, process, procedure, list of suppliers, list of customers, business code, or improvement thereof. Irrespective of novelty, invention, patentability, the state of the prior art, and the level of skill in the business, art, or field to which the subject matter pertains, a trade secret is considered to be:

1.  Secret;

2.  Of value;

3.  For use or in use by the business; and

4.  Of advantage to the business, or providing an opportunity to obtain an advantage, over those who do not know or use it

07 2096
**FILED**
NOV 1 5 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

when the owner thereof takes measures to prevent it from becoming available to persons other than those selected by the owner to have access thereto for limited purposes.

(d)  "Copy" means any facsimile, replica, photograph, or other reproduction in whole or

in part of an article and any note, drawing, or sketch made of or from an article or part or portion thereof.

(2)  Any person who, with intent to deprive or withhold from the owner thereof the control of a trade secret, or with an intent to appropriate a trade secret to his or her own use or to the use of another, steals or embezzles an article representing a trade secret or without authority makes or causes to be made a copy of an article representing a trade secret is guilty of a felony of the third degree, punishable as provided in s. 775.082 or s. 775.083.

(3)  In a prosecution for a violation of the provisions of this section, it is no defense that the person so charged returned or intended to return the article so stolen, embezzled, or copied.

**History.**--ss. 1, 2, 3, ch. 74-136; s. 1, ch. 85-34; s. 1240, ch. 97-102.

Copyright © 1995-2006 The Florida Legislature • Privacy Statement • Contact Us



# Computer Crime and Intellectual Property Section (CCIPS)

---

# VIII. Theft of Commercial Trade Secrets

A.      Introduction

B.      The Economic Espionage Act of 1996: 18 U.S.C.§§ 1831-1839

B.1.    Overview of the statute

B.2.    Elements common to 18 U.S.C. §§ 1831, 1832

B.2.a.  Misappropriation

B.2.b.  Knowledge

B.2.c.  Trade secret status

B.3.    Additional 18 U.S.C. § 1831 element: intent to benefit a foreign government, foreign instrumentality, or foreign agent

B.4.    Additional 18 U.S.C. § 1832 elements

B.4.a.  Economic benefit to a third party

B.4.b.  Intent to injure the owner of the trade secret

B.4.c.  Product produced for or placed in interstate or foreign commerce

B.5.    Attempts and conspiracies

B.6.    Potential defenses

B.6.a.  Parallel development

B.6.b.  Reverse engineering

B.6.c.  General knowledge

B.6.d.  The First Amendment

B.6.e.  Advice of counsel or claim of right

B.6.f.  Statutory challenges

B.7.    Criminal forfeiture

B.8.    Civil proceedings

B.9.    Confidentiality and the use of protective orders

B.10.   Extraterritoriality




**STATE ATTORNEY**

FIFTEENTH JUDICIAL CIRCUIT OF FLORIDA
IN AND FOR PALM BEACH COUNTY

*YES you
Have A
VALid CRIMINAL
CompIAINT AgAiNst
defeNdANts FoR
Robbery oF youR
TRADe SecRets*

BARRY E. KRISCHER
STATE ATTORNEY

August 28, 2003

George May
P.O. Box 32247
Palm Beach Gardens, FL 33420

Re: "Filing a Complaint"

Dear Mr. May:

Your letter of August 21, 2003 addressed to Mr. Krischer has been turned over to me for response.

This office is charged with the prosecution of crimes. We cannot proceed with a case until we receive information from an investigating agency with a probable cause determination.

I would suggest that your contact the police agency in the jurisdiction where these incidents occurred. This would be either the municipal police department or the Palm Beach County Sheriff's Office. If after an appropriate investigation the agency involved is of the opinion that there is probable cause for a criminal prosecution they will present the case to this office for review.

In the interim I would suggest that you pursue all civil remedies available to you and I am returning the papers you enclosed in your said letter.

Sincerely,

Jack Ackerman
Assistant State Attorney

*INVeNtioNs
We Suggest
you File
A CompIAiNt*

xc: SAO File

*NO Affidavit
By Michael K
Winston
John R. Hart*

# ARLTON FIELDS

### ATTORNEYS AT LAW

ATLANTA
MIAMI
ORLANDO
ST. PETERSBURG
TALLAHASSEE
TAMPA

WEST PALM BEACH

Esperanté
222 Lakeview Avenue, Suite 1400
West Palm Beach, Florida 33401-6149
P.O. Box 150
West Palm Beach, Florida 33402-0150

561.659.7070
561.659.7368 fax
www.carltonfields.com

September 21, 2004

Honorable Elizabeth T. Maass
Administrative Judge
Circuit Court for the 15th Judicial Circuit
in and for Palm Beach County, Florida
Courthouse
205 N. Dixie Highway
West Palm Beach, FL 33401

**VIA HAND DELIVERY**

**RECEIVED**

SEP 2 3 2004

CHAMBERS OF JUDGE
ELIZABETH T. MAASS

Re:    *Pro Se* Plaintiff George May

Dear Judge Maass:

Despite there being three orders precluding George May from filing further actions in this circuit, Mr. May continues to file and the Clerk of Court continues to accept for filing, frivolous and vexatious suits.  See attached docket for May v. Viacom, Case No. 04-8739 filed on September 15, 2004, two weeks after U.S. District Judge Marra dismissed the same claims against the same defendants.

In your capacity as Administrative Judge, we are requesting that you take whatever steps necessary to ensure that the Clerk of the Court complies with your Order, Judge Berger's Order, and Judge Labarga's Order (copies attached).

Please contact me if you have any questions regarding the foregoing.

Sincerely,

Michael K. Winston

cc:    Dorothy Wilken
       Sharon Bock

IN THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY,
FLORIDA

CASE NO. 502004CA004938XXXXMB

GEORGE MAY,
     Plaintiff(s),
vs.

PATRICK C. BARTHET, ANDREW M.
FELDMAN, MICHAEL K. WINSTON,
JOHN R. HART, PAUL D. BREITNER,
GLENN SCHAEFFER, MICHAEL ENSIGN,
MANDALAY RESORTS GROUP, INC.,
INTERNATIONAL GAME TECHNOLOGY,
INC., G. THOMAS BAKER, CHARLES N.
MATHEWSON,
     Defendant(s).

_____/

STATE OF FLORIDA
vs.

GEORGE MAY

_____/

*[handwritten: CHARLIE CRIST PAYED OFF BY IS/SOf CAPRI PAID OFF ELIZABETH T. MASS AND JACK ACKERMAN AND RICL BRADSHAW +]*

## ORDER AND AMENDED ORDER TO SHOW CAUSE (INDIRECT CRIMINAL CONTEMPT OF COURT)

*[handwritten: MARK H. BANNON]*

THIS CAUSE came before the Court November 12, 2004 on the Court's Order to Show Cause (Indirect Criminal Contempt of Court), with Jack Ackerman, Assistant State Attorney, and counsel for Defendants present. Mr. May did not appear. It appears that Mr. May has not yet been served with the Court's October 4, 2004 Order to Show Cause (Indirect Criminal Contempt of Court). Based on the foregoing and on the proceedings before the Court, it is

ORDERED AND ADJUDGED that the Court's October 4, 2004 Order to Show

*[handwritten: TO PREVENT A JURY TRIAL PAYMENT TO GEORGE MAY]*

Cause (Indirect Criminal Contempt) is vacated and the following substituted:

THIS CAUSE came before the Court, in Chambers, on the letter from counsel Michael Winston, a copy of which is attached as Exhibit A. The Court takes judicial notice of the Court file in case number 502004CA008739XXXXMB. On review of the Court file in case number 502004CA008739XXXXMB, the undersigned noted that it appears that George May has filed a Complaint without first obtaining leave of the administrative judge for the circuit, in direct violation of this Court's Order of Dismissal with Prejudice, Directions to the Clerk and Prefiling Order Under Florida Statute §68.093, entered July 15, 2004, a copy of which is attached as Exhibit B ("Order"). Based on the foregoing, it is

ORDERED AND ADJUDGED that George May shall personally appear before the Court January 14, 2004, at 8:00 a.m., 1 hour reserved, in Courtroom 11A, Palm Beach County Courthouse, 205 N. Dixie Highway, West Palm Beach, FL 33401, to show cause why he should not be held in indirect criminal contempt of court for violation of the Court's July 15, 2004 Order. The Sheriff is directed to secure service of this Order on George May. Arraignment shall be held in conjunction with the show cause hearing, unless George May requests a prior arraignment. It is further

ORDERED AND ADJUDGED that hearing shall be held

December 17, 2004, at 9:00 a.m., 15 minutes reserved in Courtroom 11A, Palm Beach County Courthouse, 205 N. Dixie Highway, West Palm Beach, FL 33401, to determine whether George May is indigent for purposes of appointment of counsel. It is further

ORDERED AND ADJUDGED that the Office of the State Attorney is appointed to prosecute this matter. See Rule 3.840 (d), Fla. R. Crim. P.

DONE AND ORDERED in West Palm Beach, Palm Beach County, Florida this 16 day of November, 2004.

ELIZABETH T. MAASS
Circuit Court Judge

copies furnished:
Jack Ackerman, Assistant State Attorney
401 N. Dixie Highway
West Palm Beach, FL  33401

George May
P.O. Box 32247
Palm Beach Gardens, FL  33420

George May
2474 Savage Blvd.
Port St. Lucie, FL  34953

Michael K. Winston, Esq.
222 Lakeview Ave., Suite 1400
P.O. Box 150
West Palm Beach, FL  33401

Paul D. Breitner, Esq.
200 S. Biscayne Blvd., Suite 1800
Miami, FL  33131

John R. Hart, Esq.
222 Lakeview Ave., Suite 1400
P.O. Box 150
West Palm Beach, FL  33401

Carey Houghwout, Public Defender
405 N. Dixie Highway
West Palm Beach, FL  33401

Port St. Lucie Sheriff's Office
Civil Process Unit
Attn: Heather
218 South Second Street, Rm. 133
Ft. Pierce, FL  34950

IN THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY,
FLORIDA

CASE NO. 502004CA004938XXXXMB

GEORGE MAY,
     Plaintiff(s),
vs.

PATRICK C. BARTHET, ANDREW M.
FELDMAN, MICHAEL K. WINSTON,
JOHN R. HART, PAUL D. BREITNER,
GLENN SCHAEFFER, MICHAEL ENSIGN,
MANDALAY RESORTS GROUP, INC.,
INTERNATIONAL GAME TECHNOLOGY,
INC., G. THOMAS BAKER, CHARLES N.
MATHEWSON,
     Defendant(s).

_____/

*68.093*
*does Not*
*Apply to*
*George MAY*
*Complaint for*
*Theft, Robbery*

## ORDER OF DISMISSAL WITH PREJUDICE, DIRECTIONS TO THE CLERK AND PREFILING ORDER UNDER FLORIDA STATUTE §68.093

THIS CAUSE came before the Court July 14, 2004 on Defendants' Requests for Dismissal by Administrative Judge pursuant to Florida Statute §68.093 (5) ("Motions"), with Defendants' counsels only present. Plaintiff failed to appear. Based on the proceedings before the Court and the Court's having reviewed the Motions and file, heard argument of counsel, and taken judicial notice of public records that determine Plaintiff is a "vexatious litigant" as defined in Florida Statute §68.093 (2) (d), and being otherwise advised in the premises, it is

ORDERED AND ADJUDGED that the Requests are Granted. This action is hereby dismissed, with prejudice. The Court reserves jurisdiction to award sanctions, which may include an award of attorneys' fees. It is further

ORDERED AND ADJUDGED that Plaintiff, George May, is prohibited from commencing pro se any new action in the courts of the 15th Judicial Circuit, State of Florida, including the County Court in and for Palm Beach County, Florida without first

obtaining leave of the administrative judge for the circuit. Disobedience of this Order may be punished by contempt of court. Leave of court shall be granted only on a showing that the proposed action is meritious and is not being filed for the purpose of delay or harassment. The administrative judge may condition the filing of the proposed action on the furnishing of security as provided in Florida Statute §68.093, or any successor law. The Clerk of Court shall provide a copy of this prefiling order to the Clerk of the Florida Supreme Court. Fla. Stat. §68.093 (b). The Clerk of Court shall not file any new action, as defined by Florida Statute §68.093 (2) (a), by Plaintiff pro se unless Plaintiff has obtained an order from the administrative judge permitting such filing.

DONE AND ORDERED in West Palm Beach, Palm Beach County, Florida this 15 day of July, 2004.

_____
ELIZABETH T. MAASS
Circuit Court Judge

copies furnished:
George May
P.O. Box 32247
Palm Beach Gardens, FL 33420

Paul D. Breitner, Esq.
200 S. Biscayne Blvd., Suite 1800
Miami, FL 33131

John R. Hart, Esq.
222 Lakeview Ave., Suite 1400
P.O. Box 150
West Palm Beach, FL 33401

Dorothy H. Wilken
Clerk of Court
301 N. Olive Ave., 9th Floor
West Palm Beach, FL 33401

*[handwritten:]* Elizabeth T MASS paid off by Charlie Crist Isle of Capri Casino to Again Rob George MAY and Rob George MAY Liberty Right to Access the courts

IN THE CIRCUIT COURT OF THE
FIFTEENTH JUDICIAL CIRCUIT, IN
AND FOR PALM BEACH COUNTY,
FLORIDA
CASE.NO CA 04 8739 AN

GEORGE MAY
    Plaintiff(s),

vs.

CAROL C LUMPKIN et al
    Defendant(s).

**CLOSED**

_____/

## <u>ORDER OF DISMISSAL</u>

THIS MATTER came before the Court upon Defendants, Carol C.

Lumpkin, Michael C. Marsh, Hilton Hotels Corp., Barron Hilton, Viacom,

Inc., and Sumner M. Redstone's Notice to Clerk of Court of Pre-filing

Orders, Notice of Automatic Stay and Request for Dismissal by

Administrative Judge.  Upon considering the Motion and being otherwise

fully advised in the premises, it is hereby

ORDERED AND ADJUDGED that this matter is dismissed without

prejudice to Plaintiff seeking an Order from Judge Elizabeth Maass

allowing its filing and referring same to Judge Maass for consideration of

potential sanctions for violation of her Order dated July 15, 2004.

DONE AND ORDERED in West Palm Beach, Palm Beach County,

Florida on this 14th day of October, 2004.

JEFFREY A. WINIKOFF
CIRCUIT COURT JUDGE

IN THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY,
FLORIDA

CASE NO.  502004CA004938XXXXMB

GEORGE MAY,
     Plaintiff(s),

vs.

PATRICK C. BARTHET, ANDREW M.
FELDMAN, MICHAEL K. WINSTON,
JOHN R. HART, PAUL D. BREITNER,
GLENN SCHAEFFER, MICHAEL ENSIGN,
MANDALAY RESORTS GROUP, INC.,
INTERNATIONAL GAME TECHNOLOGY,
INC., G. THOMAS BAKER, CHARLES N.
MATHEWSON,
     Defendant(s).

_____/

## ORDER OF DISMISSAL WITH PREJUDICE, DIRECTIONS TO THE CLERK AND PREFILING ORDER UNDER FLORIDA STATUTE §68.093

THIS CAUSE came before the Court July 14, 2004 on Defendants' Requests for Dismissal by Administrative Judge pursuant to Florida Statute §68.093 (5) ("Motions"), with Defendants' counsels only present.  Plaintiff failed to appear.  Based on the proceedings before the Court and the Court's having reviewed the Motions and file, heard argument of counsel, and taken judicial notice of public records that determine Plaintiff is a "vexatious litigant" as defined in Florida Statute §68.093 (2) (d), and being otherwise advised in the premises, it is

ORDERED AND ADJUDGED that the Requests are Granted.  This action is hereby dismissed, with prejudice.  The Court reserves jurisdiction to award sanctions, which may include an award of attorneys' fees.  It is further

ORDERED AND ADJUDGED that Plaintiff, George May, is prohibited from commencing pro se any new action in the courts of the 15th Judicial Circuit, State of Florida, including the County Court in and for Palm Beach County, Florida without first

obtaining leave of the administrative judge for the circuit.  Disobedience of this Order may be punished by contempt of court.  Leave of court shall be granted only on a showing that the proposed action is meritious and is not being filed for the purpose of delay or harassment.  The administrative judge may condition the filing of the proposed action on the furnishing of security as provided in Florida Statute §68.093, or any successor law.  **The Clerk of Court shall provide a copy of this prefiling order to the Clerk of the Florida Supreme Court.  Fla. Stat. §68.093 (b).  The Clerk of Court shall not file any new action, as defined by Florida Statute §68.093 (2) (a), by Plaintiff pro se unless Plaintiff has obtained an order from the administrative judge permitting such filing.**

DONE AND ORDERED in West Palm Beach, Palm Beach County, Florida this 15 day of July, 2004.

ELIZABETH T. MAASS
Circuit Court Judge

copies furnished:
George May
P.O. Box 32247
Palm Beach Gardens, FL  33420

Paul D. Breitner, Esq.
200 S. Biscayne Blvd., Suite 1800
Miami, FL  33131

John R. Hart, Esq.
222 Lakeview Ave., Suite 1400
P.O. Box 150
West Palm Beach, FL  33401

Dorothy H. Wilken
Clerk of Court
301 N. Olive Ave., 9th Floor
West Palm Beach, FL  33401

IN THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY,
FLORIDA

CASE NO.  502004CA004938XXXXMB

GEORGE MAY,
     Plaintiff(s),
vs.

PATRICK C. BARTHET, ANDREW M.
FELDMAN, MICHAEL K. WINSTON,
JOHN R. HART, PAUL D. BREITNER,
GLENN SCHAEFFER, MICHAEL ENSIGN,
MANDALAY RESORTS GROUP, INC.,
INTERNATIONAL GAME TECHNOLOGY,
INC., G. THOMAS BAKER, CHARLES N.
MATHEWSON,
     Defendant(s).

_____/

## ORDER TO SHOW CAUSE
### (INDIRECT CRIMINAL CONTEMPT OF COURT)

THIS CAUSE came before the Court, in Chambers, on the letter from counsel

Michael Winston, a copy of which is attached as Exhibit A.  The Court takes judicial notice

of the Court file in case number 502004CA008739XXXXMB.  On review of the Court file

in case number 502004CA008739XXXXMB, the undersigned noted that it appears that

George May has filed a Complaint without first obtaining leave of the administrative judge

for the circuit, in direct violation of this Court's Order of Dismissal with Prejudice,

Directions to the Clerk and Prefiling Order Under Florida Statute §68.093, entered July 15,

2004, a copy of which is attached as Exhibit B ("Order").  Based on the foregoing, it is

ORDERED AND ADJUDGED that George May shall personally appear before the

Court December 17, 2004, at 8:00 a.m., 1 hour reserved, in Courtroom 11A, Palm Beach

County Courthouse, 205 N. Dixie Highway, West Palm Beach, FL  33401, to show cause

why he should not be held in indirect criminal contempt of court for violation of the Court's

July 15, 2004 Order.  The Sheriff is directed to secure service of this Order on George May.

Arraignment shall be held in conjunction with the show cause hearing, unless George May requests a prior arraignment. It is further

ORDERED AND ADJUDGED that hearing shall be held

November 12, 2004, at 8:45 a.m., 15 minutes reserved

in Courtroom 11A, Palm Beach County Courthouse, 205 N. Dixie Highway, West Palm Beach, FL 33401, to determine whether George May is indigent for purposes of appointment of counsel.

DONE AND ORDERED in West Palm Beach, Palm Beach County, Florida this 4 day of October, 2004.

ELIZABETH T. MAASS
Circuit Court Judge

copies furnished:
Michael K. Winston, Esq.
222 Lakeview Ave., Suite 1400
P.O. Box 150
West Palm Beach, FL 33401

George May
P.O. Box 32247
Palm Beach Gardens, FL 33420

Paul D. Breitner, Esq.
200 S. Biscayne Blvd., Suite 1800
Miami, FL 33131

John R. Hart, Esq.
222 Lakeview Ave., Suite 1400
P.O. Box 150
West Palm Beach, FL 33401

Dorothy H. Wilken
Clerk of Court
301 N. Olive Ave., 9th Floor
West Palm Beach, FL 33401

IN THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY,
FLORIDA

CASE NO.  502004CA004938XXXXMB

GEORGE MAY,
     Plaintiff(s),
vs.

PATRICK C. BARTHET, ANDREW M.
FELDMAN, MICHAEL K. WINSTON,
JOHN R. HART, PAUL D. BREITNER,
GLENN SCHAEFFER, MICHAEL ENSIGN,
MANDALAY RESORTS GROUP, INC.,
INTERNATIONAL GAME TECHNOLOGY,
INC., G. THOMAS BAKER, CHARLES N.
MATHEWSON,
     Defendant(s).

_____/

STATE OF FLORIDA
vs.

GEORGE MAY

_____/

*Void Florida Statute 68,093 does Not Apply To Complaint for Robbery A Criminal Complaint*

## JUDGMENT OF GUILT AND ORDER OF ARREST

THIS CAUSE came before the Court January 14, 2005 on its Amended Order to Show Cause why George May should not be found in indirect criminal contempt of court, with the special prosecutor and counsel for interested parties present.  George May failed to appear.  Based on the proceedings before the Court, the Court makes the following findings of fact and conclusions of law:

1.    On July 15, 2004, this Court entered its Order of Dismissal with Prejudice, Directions to the Clerk and Prefiling Order under Florida Statute §68.093 ("Order"), after notice to Mr. May and hearing.

2.    The Order prohibited Mr. May "from commencing pro se any new action in the

courts of the Fifteenth Judicial Circuit, State of Florida, including the County Court in and for Palm Beach County, Florida without first obtaining leave of the administrative judge for the circuit. Disobedience of this Order may be punished by contempt of order."

3.    Mr. May appealed the Order and, therefore, had actual knowledge of its entry and terms.

4.    On September 15, 2004, Mr. May caused to be filed a Complaint in the Fifteenth Judicial Circuit , State of Florida, styled May v. Lumpkin, et al., and assigned case number 502004CA008739XXXXMB. That action was filed pro se by Mr. May, without benefit of counsel, and without first obtaining leave of the administrative judge for this circuit.

5.    Mr. May has never been a member of The Florida Bar.

6.    Mr. May was personally served with the Amended Order to Show Cause on December 17, 2004, and has actual knowledge of these proceedings.

7.    Mr. May has willfully and contumaciously violated the Order, with actual knowledge of its entry and terms.

Based on the foregoing, it is

ORDERED AND ADJUDGED that George May is guilty of indirect criminal contempt of court and is hereby sentenced to six months in the County Jail. This sentence shall not be served concurrently with any other sentence. The Sheriff or his deputy is hereby ordered to arrest Mr. May so that he may commence service of the sentence imposed herein, forthwith.

DONE AND ORDERED in West Palm Beach, Palm Beach County, Florida this 19 day of January, 2005.

ELIZABETH T. MAASS
Circuit Court Judge



PALM BEACH COUNTY
**SHERIFF'S OFFICE**
RIC L. BRADSHAW, SHERIFF

LIEUTENANT MARK E. BANNON
FUGITIVE WARRANTS SECTION
PHONE: (561) 688-3958

FAX: (561) 688-3933

E-MAIL: bannonm@pbso.org



May 25, 2005

Mr. George May
P.O. Box 32247
Palm Beach Gardens, FL 33420

*Sheriff Paid
off by
Charlie Crist
Isle of Capri*

Re.  Letter to Sheriff Ric Bradshaw dated 5/21/05

Dear Mr. May:

Let me make this very clear to you.  Neither Sheriff Bradshaw nor his deputies have the authority to review an arrest warrant signed by a Circuit Judge and determine that it is in violation of the Constitution, and therefore void.  What you seek is a judicial remedy outside of the scope of a Florida Sheriff's powers.

However, I have a suggestion for you.  Seek the counsel of a qualified, licensed attorney with this problem and allow him or her to address it.  They may know of a more palatable remedy for your problem than simply surrendering to authorities.

In any case, until such time as an authoritative court of law determines that the warrant for your arrest is not valid, and issues an order to recall it, it will remain active.

As an aside, the statute of limitations for misdemeanors only applies to charges where there has been no arrest or issuance of an arrest warrant or capias.  Once the warrant for your arrest was signed by a judge, the statute of limitations no longer applied.

Respectfully,

Lt. Mark E. B

Lieutenant Mark E. Bannon
Commander, Fugitive Warrants Section

**PALM BEACH COUNTY**
# SHERIFF'S OFFICE
*RIC L. BRADSHAW, SHERIFF*



LIEUTENANT MARK E. BANNON
FUGITIVE WARRANTS SECTION
PHONE: (561) 688-3950

FAX: (561) 688-3933

E-MAIL: bannonm@pbso.org

February 15, 2005

Mr. George May
P.O. Box 32247
Palm Beach Gardens, FL 33420

Dear Mr. May:

Pursuant to your request for information about active arrest warrants for your person, currently held by the Palm Beach County Sheriff's Office.

You currently have an outstanding arrest warrant for a charge of contempt of court issued in 2003 by Judge Rapp. I have no information on any other existing arrest warrants for you at this time.

I would recommend that you surrender yourself to clear this matter up. At this point there is no bond listed, so you would need to see a judge at 1ˢᵗ appearance in order to have a bond set to be released.

This will be my only communication with you concerning active arrest warrants in your name. I will not become your source for checking on arrest warrant status on a continuing basis, especially since it appears you have no inclination to surrender to the proper authorities at this time.

Arrest warrants that are not yet served are <u>not</u> public information, and therefore not subject to Florida's laws on release of public information. *Rule 2.051(c)(6), Florida Rules of Judicial Administration (2005).*

Respectfully,

*Lt. Mark E. B*

Lieutenant Mark E. Bannon
Commander, Fugitive Warrants Section



## UNITED STATES PATENT AND TRADEMARK OFFICE

UNDER SECRETARY OF COMMERCE FOR INTELLECTUAL PROPERTY AND
DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE

February 28, 2006

Mr. George May
P.O. Box 32247
Palm Beach Gardens, FL 33420

Dear Mr. May:

Thank you for your letter to Secretary of Commerce Gutierrez regarding alleged infringements of your intellectual property rights. Your letter has been referred for response to the United States Patent and Trademark Office ("USPTO").

USPTO advises the Secretary and the President on domestic and international intellectual-property law and policy. As you probably know, USPTO is not a law-enforcement agency. USPTO does, however, assist the Secretary in his efforts to ensure that all citizens are aware of the rights and remedies available to them under U.S. intellectual property laws. Therefore, although USPTO can neither enforce your rights nor offer any specific legal advice about their merits, we can provide some general guidance on the laws that can provide legal remedies to citizens who believe that others have infringed their intellectual property rights.

The documents that you provided allege that certain entities have made unauthorized use of ideas, inventions, trademarks, trade secrets, and copyrighted works in interstate commerce and over the Internet. Under U.S. law, the principal means for remedying such infringements is a civil lawsuit brought by the rights holder against the alleged infringers. In general, lawsuits alleging infringements of copyrights, trademarks, or patents must be filed in a Federal district court. Moreover, a Federal court with jurisdiction to adjudicate such a suit can often adjudicate related state-law claims such as misappropriation of trade secrets.

If infringements of protected intellectual property rights are proven in a civil lawsuit, Federal law generally provides civil remedies to punish past infringements and deter future infringements. For your convenience, the general civil-remedy provisions of some potentially relevant laws are summarized below:

- **Copyrights:** Most of the civil-relief provisions of the Copyright Act are codified in Chapter 5 of Title 17 of the United States Code. *See* 17 U.S.C. §§ 501-505, 507-509, 512. Remedies available include, injunctions, civil damages, statutory damages, attorney fees, costs, and the seizure of infringing copies of protected works. *See id.* at §§ 502-505. As you note, the U.S. is also a party to international treaties that prescribe certain

protections to deter copyright infringement over the Internet. Those protections, and their associated civil-relief provisions, are codified at 17 U.S.C. §§ 1201-05.

- **Trademarks:** The civil-relief provisions of the Lanham Act are codified at 15 U.S.C. §§ 1111-1121. Remedies potentially available include injunctions, civil damages, attorney fees, costs, and the destruction of infringing goods. *See id.* at §§ 1116-1118.

- **Patents:** The civil-relief provisions of the Patent Act are codified at 35 U.S.C. §§ 271-73. Remedies available include injunctions, civil damages (which may be trebled), attorney fees, and costs. *See id.* at §§ 283-85.

- **Trade Secrets:** In general, trade secrets are protected through state law. You can consult your state's civil code to determine how it protects trade secrets.

An attorney familiar with intellectual property litigation can provide you with legal advice and discuss the potential merits of your particular claims. While the Department cannot recommend specific attorneys, we can urge you to contact your state bar association. Most provide lawyer-referral services that may help you identify attorneys with relevant expertise.

As you note, in some cases, Federal law does provide criminal penalties against parties who violate intellectual property rights. Various provisions of the United States Criminal Code describe the circumstances in which infringements of intellectual property rights may involve criminal offenses. The United States Department of Justice provides some guidance on the factors it considers when deciding whether to investigate and prosecute any potential intellectual-property crime. *See generally* U.S. DEPARTMENT OF JUSTICE, PROSECUTING INTELLECTUAL PROPERTY CRIMES 115-16 (2001).

Nevertheless, even rights holders who report potential intellectual property crimes to the Department of Justice should still consider seeking a civil remedy. The standards of proof are much more easily met, and civil remedies can be sought only for a limited time. Moreover, U.S. intellectual-property laws are generally designed to provide, in appropriate cases, civil remedies potent enough to punish past infringements and deter future infringements even in the absence of criminal prosecution.

I hope the above information is responsive to your needs.

Sincerely,

Lois Boland
Director
Office of International Relations

2



**U.S. Department of Justice**
*Office of Consumer Litigation*
*Civil Division*
*Washington, DC  20530*

February 23, 2006

George May
P.O. Box 32247
Palm Bch. Gardens, FL 33420

Re: <u>Alleged Violation of Intellectual Property</u>

Dear Mr. May:

This is in response to your letters dated January 31 and February 1, 2006 to the Attorney General which were forwarded to our Office for consideration and response. In your letters, you allege that MGM Mirage and International Game Technology, Inc., violated your intellectual property rights by building a theme park based on the "Star Trek" series outside of one of its hotels. You believe that you are the "Title owner" of the idea to use the "Star Trek" series as a theme for a park; as a result, you are requesting that you be compensated in the amount of $10.8 billion dollars for what you allege to be "piracy."

Matters that cannot otherwise be resolved frequently can be settled through legal proceedings instituted by individuals on their own behalf. Many consumer protection statutes provide for such private legal actions by individuals. Therefore, I can only suggest that, if you have not yet done so, you may wish to consult a private attorney who could advise you of your rights and any remedies available to you.

You may also wish to access the Computer Crime and Intellectual Property Section of the Department of Justice at their website at http://www.usdoj.gov/criminal/cybercrime/index.html.

Thank you for contacting the Department of Justice.

Sincerely yours,

Kenneth L. Jost
Assistant Director
Office of Consumer Litigation
Civil Division

By: Kavitha Bondada
Consumer Affairs Specialist

Yahoo!  My Yahoo!  Mail    Make Yahoo! your home page

Search

**YAHOO!** FINANCE  Sign In
New User?

*AP* Associated Press

**Welcome** [     ]

To track stocks & more,

## Financial News

Enter symbol(s)        Basic    ▼  Get

AP

# China to Increase Copyright Enforcement

Tuesday April 11, 8:30 pm ET
By Martin Crutsinger, AP Economics Writer

### China to Crack Down on Copyright Piracy of American Computer Programs, Lift Ban on U.S. Beef

WASHINGTON (AP) — The Bush administration, seeking to shrink a soaring trade deficit with China, won agreements Tuesday that the Chinese government will lift a ban on American beef, crack down on copyright piracy and move toward opening up its government bidding process to American firms.

The exact timetable for lifting the beef ban was left open, however, pending further negotiations over details governing the standards that will be applied to beef shipped to China. Agriculture Secretary Mike Johanns predicted such shipments would resume sometime this year.

China halted U.S. beef shipments after mad cow disease was discovered in the United States in December 2003.

The announcement on beef and the pledge for a greater crackdown on piracy of American computer software and other copyrighted products came after a day of high-level economic talks the Bush administration hopes will reduce growing anger in Congress over a trade deficit with China that hit a record $202 billion last year.

The discussions were being held in advance of a Washington visit next week by Chinese President Hu Jintao.

"One meeting is not going to solve all of our outstanding trade issues with China," U.S. Trade Representative Rob Portman said at a joint news conference with the Chinese. "But in our discussions today, which were very frank and positive, we were able to solve some problems."

Chinese Vice Premier Wu Yi, who led the Chinese delegation, said her country has been "earnestly implementing" the directions of China's top leaders to boost imports from the United States.

She said the annual meeting Tuesday of the Joint Commission on Commerce and Trade, designed to smooth economic relations between the two countries, had "demonstrated the good will of both sides to properly resolve problems through equal consultation."

Wu noted that she is traveling with a delegation of more than 200 Chinese business executives with the expectation that they will sign 107 contracts to buy $16.2 billion in U.S. products.

Included in that is a deal to purchase 80 commercial jetliners from Boeing Co., at a list price of $4.6 billion. This agreement, signed Tuesday, completes a commitment China made last November, during a visit by President Bush, to buy a total of 150 Boeing jetliners.

In the area of piracy, the Chinese agreed to require that computers use legal software and to step up enforcement of intellectual property rights. They also pledged to close Chinese optical disk plants that are producing pirated CDs and DVDs.

In her comments, Wu said regulations would be issued stipulating that all computers sold in China must have legal operating systems.

The Chinese have made previous pledges to crack down on copyright piracy but piracy rates for computer software remain near 90 percent. Commerce Secretary Carlos Gutierrez said the U.S. government would be watching for

results in terms of increased sales of legal goods and an increase in prosecutions of copyright violators.

"As in everything else, the numbers will ultimately tell the story," Gutierrez told reporters.

The administration has been pushing the Chinese for greater commitments to deal with trade barriers, which U.S. firms contend are costing them billions of dollars in lost sales, and to stop holding down the value of their currency in relation to the dollar.

China also agreed to start the process to join an agreement administered by the World Trade Organization that governs standards foreign companies must meet when bidding for government contracts, a key goal for U.S. companies anxious to break into China's multibillion-dollar market for government contracts.

U.S. industry and members of Congress had generally favorable reactions to the agreements announced Tuesday.

Sen. Max Baucus, D-Mont., called the beef agreement a "critical first step" to getting American beef back into China.

Robert Holleyman, head of the Business Software Alliance, said what was critical would be for China to "translate these principles into concrete action."

Neil Turkewitz, executive vice president for international affairs at the Recording Industry Association of America, said he hoped the new commitments would help China achieve its goal of cutting copyright piracy in half.

Frank Vargo, vice president for international affairs at the National Association of Manufacturers, said the commitments represented "incremental contributions." He said his organization hoped to see significant progress next week during Hu's visit on the issue of China's manipulation of its currency to gain trade advantages.

Alan Tonelson, a research follow at the U.S. Business Industry Council, which represents many small manufacturing companies, said the Bush administration had settled for "photo ops and tokenism" rather than insisting on real changes in China's unfair trade practices.

On Monday, Bush said he would raise the currency issue with Hu at the meeting a week from Thursday.

"He's coming into a country where there's over a $200 billion trade deficit, and a lot of Americans are wondering where's the equity in trade," Bush said. "I think he could help the Americans understand the importance of a free-trading world if he were to maybe make a statement on his currency, for example."

The administration has been pressing China for more than two years to allow its currency to rise in value against the U.S. dollar. American manufacturers contend China unfairly depresses the value of its currency to make Chinese goods cheaper in America and U.S. products more expensive in China.

U.S. Trade Representative: http://www.ustr.gov

White House: http://www.whitehouse.gov

Commerce Department: http://www.commerce.gov

Copyright © 2006 Yahoo! Inc. All rights reserved. Privacy Policy - Terms of Service - Copyright Policy - Ad Feedback
Copyright © 2006 The Associated Press. All rights reserved. The information contained in the AP News report may not be published, broadcast, rewritten, or redistributed without the prior written authority of The Associated Press.

This is a printer friendly version of an article from **News-Leader.com**
To print this article open the file menu and choose Print.

Back

**Published June 5, 2006**

# Harrah's fails to gain entry into Asia

*After losing bid to build resort, company faces being shut out of growing market.*

**By Ryan Nakashima**
**THE ASSOCIATED PRESS**

LAS VEGAS — Five years ago, the casino company that is now Harrah's Entertainment Inc. decided not to bid for a gambling license in the booming Chinese enclave of Macau while its competitors pushed in their chips.

Now, the world's largest casino operator faces the prospect of being shut out of Asia — regarded as the world's most dynamic gambling market — after losing its bid last week to build a new resort in Singapore's Marina Bay.

Wall Street hailed bid winner Las Vegas Sands Corp., a company that earned credibility in the Far East by becoming the first North American casino company to open shop in Macau in May 2004. Las Vegas Sands now boasts nearly double the market capitalization of Harrah's, around $25 billion, primarily because of its Asian growth prospects.

Jefferies & Company analyst Lawrence Klatzkin increased his target for Sands' shares by $8 to $88.25 after the Singapore license win. Sands now trades around $71.

Meanwhile, Harrah's is playing a game of catch-up in a region in which its Las Vegas-based competitors, Sands, MGM Mirage Inc. and Wynn Resorts Ltd., are plowing billions of dollars and counting on rich returns.

"It's a concern," said Harrah's spokesman Alberto Lopez. "It's an area of concentration. It's an area where we know that we need to move forward deftly, if you will."

Analyst Dennis Forst of Keybanc Capital Markets said the loss puts Harrah's in a difficult position.

"It is a hole in their portfolio and something that they are probably spending a lot of time analyzing how to get into both Macau and other places in the Far East," Forst said. "It puts them obviously at a disadvantage in that part of the world."

Some observers say the game is almost up.

Wynn's $1.1 billion Wynn Macau resort is set to open Sept. 5, followed by a second Sands project, the $1.8 billion The Venetian Macao next year. Also, an MGM-Pansy Ho joint venture, the MGM Grand Macau, costing about $975 million, is scheduled to be completed late next year, while others are in the works.

Macau is not likely to expand the number of gambling concessions and sub-concessions — there are six — at least through 2009 after overturning a monopoly in 2002, according to University of Macau law professor Jorge Godinho.

That leaves a second Singapore license — on the resort island of Sentosa — the only remaining opening in Asia for what could be a decade.

"Any contenders for that concession are all fully aware that it's a make-it-or-break-it decision," Godinho said. "If they fail to get a license there, well, that's it. They would have to explore other

markets in Europe or other parts of the world in the immediate future."

Before the government in Macau handed out new casino licenses in 2002, many casino operators were hesitant to enter the former Portuguese colony, which once was rife with gangsters and had just reverted to Chinese control in 1999.

Lopez said Harrah's decided not to bid partly because it could not offer the upscale Caesars brand, which it acquired through a megamerger last year. And even after Wynn won a Macau license in 2002, the company stalled construction over concerns about regulations that prevented casinos from extending credit.

But when the Sands Macao opened, casino companies came to a collective realization: Asians like to gamble.

The Sands paid off the $265 million it took to build its casino within a year. Wynn quickly broke ground, then in February sold off a sub-concession to a pairing of Hong Kong-based Melco International Development Ltd. and Australian firm Publishing and Broadcasting Ltd. for a staggering $900 million.

Last year, gambling wins in Macau — the net amount players lost after all the chips were counted — rose 8 percent to $5.7 billion, surpassing the Las Vegas Strip's take of $5.3 billion.

Experts see Macau's gambling revenue growing quickly to $11 billion by 2010 and upward of $15 billion by 2012.

"Asia is where the future of gaming is," said David Schwartz, coordinator of the University of Nevada, Las Vegas Gaming Studies Research Center. "It's definitely proving too good of a market to stay out of."



Email this Document!

**U.S. Department of Justice**
*United States Attorney*
*Northern District of California*
*450 Golden Gate Avenue*
*11th Floor, Federal Building*
*Box 36055*
*San Francisco, California 94102*
*(415) 436-7200*
*FAX:(415) 436-7234*

**Press Release**
**For Immediate Release**
**April 26, 2001**

### Wang and Bell Imaging Plead Guilty to Theft and Copying of Acuson Corporation Trade Secrets

**(April 26, 2001)**

The United States Attorney's Office for the Northern District of California announced that Junsheng Wang and Bell Imaging Technology Corporation pled guilty today to theft and copying of the trade secrets of Acuson Corporation.

Mr. Wang, age 53, of Fremont, and Bell Imaging, a California corporation based in Fremont, were charged in a criminal information filed in federal court on April 19, 2001. Mr. Wang was charged with theft of trade secrets in violation of Title 18, United States Code, Section 1832(a)(1), and Bell Imaging was charged with copying of trade secrets in violation of Title 18, United States Code, Section 1832(a)(2). A related company, Belson Imaging Technology Company Limited, a joint venture based in the People's Republic of China, was also charged in the information with copying trade secrets, and that charge remains pending. *TRADE SECRETS OWNED by GERARD MAY*

In pleading guilty, Mr. Wang and Bell Imaging admitted that prior to August 24, 2000, *IN* Mr. Wang took without authorization and copied for Bell Imaging a document providing *DRAWING* the architecture for the Sequoia ultrasound machine that contained the trade secrets of *LETTERS* Acuson Corporation. According to Mr. Wang's plea agreement, he had been able to obtain access to the Acuson trade secret materials because his wife was employed as an engineer at that company and because she had brought that document into their home. After Mr. Wang had copied the document, he took it with him in the year 2000 on business trips to the People's Republic of China for Bell Imaging. According to Bell Imaging's plea agreement, it is a California corporation involved in the manufacture and distribution of ultrasound transducers, and has been a partner with Henson Medical

Limited, the final defendant in this case. Mr. Wang was arrested carrying the Acuson trade secret documents at San Francisco International Airport as he was about to board a flight for Shanghai, P.R.C., in August of 2000.

The sentencings of Mr. Wang and Bell Imaging are scheduled for October 23, 2001, before Judge Jeremy Fogel in San Jose. The maximum statutory penalty for each count in violation of Title 18, United States Code, Section 1832 is 10 years and a fine of $250,000 for an individual and $5 million for a corporation, plus restitution if appropriate. However, the actual sentences will be dictated by the Federal Sentencing Guidelines, which take into account a number of factors, and will be imposed in the discretion of the Court.

The prosecutions are the result of an investigation by agents of the Federal Bureau of Investigation with cooperation from agents of the United States Customs Service. Joseph E. Sullivan is the Assistant U.S. Attorney who prosecuted the case with the assistance of Lauri Gomez.

A copy of this press release and key court documents filed in the case may also be found on the U.S. Attorney's Office's website at http://www.usdoj.gov/usao/can/.

All press inquiries to the U.S. Attorney's Office should be directed to Assistant U.S. Attorney Matthew J. Jacobs at (415)436-718, or Assistant U.S. Attorney Elizabeth De La Vega at (408) 535-5061.

### ###

- **More information on: Economic Espionage**
- **More information on: Economic Espionage Prosecutions and Press Releases**

Go to . . . CCIPS Home Page  ||  Justice Department Home Page

*Last updated June 14, 2001*
usdoj-crm/mis/jam

PPI Inc., the parent company of Pompano Park Racing and Poker, which is owned by the Isle of Capri Casinos, sent $100,000 last week to the Floridians in Truth and Integrity in Government, the electioneering committee that has sent mailers out backing Crist. Another $25,000 came from the Miccosukee Tribe.

Crist, who has said he won't support an expansion of gambling in Florida, has refrained from commenting on how he would handle the negotiations between the governor's office and the Seminole and Miccosukee indians, who want to replace their bingo-style slot machine with Las Vegas-style slots.

**Posted by Mary Ellen Klas at 07:22 PM on August 19, 2006 in**

A leading Republican campaign consultant who helped wage a last-minute campaign to try to defeat the 2004 slots amendment has paid $12,000 in fines to settle two cases before the Florida Election Commission. The commission on Friday morning approved two separate consent orders with **Roger Pennington**, the chairman of the Committee to Restore Integrity in Politics.

Pennington is a well-known political consultant and owner of a direct-mail firm who has worked on behalf of the Republican Party of Florida as well as Republican candidates. In October 2004, his committee spent more than $300,000 to send out mailers urging voters to defeat an amendment that would authorize slot machines at dog and horse tracks in Broward and Miami-Dade counties. The effort was bankrolled largely by the casino boat operators, including $475,000 from Palm Beach Casino Line. The committee was also involved in another election in Fort Myers.

But the committee was not registered as a political organization that was allowed to urge voters to defeat or approve any measure on the ballot. So the commission earlier this year ruled there was probable cause that Pennington had broken state campaign finance laws.

If the case had gone forward, Pennington could have been hit with fines in excess of $950,000. A lawyer representing Pennington would not comment on why his client decided to settle the case and pay the fines.

ARTICLE XI
AMENDMENTS

SECTION 5. Amendment or revision election.--
(a) A proposed amendment to or revision of this constitution, or any part of it, shall be submitted to
the electors at the next general election held more than ninety days after the joint resolution, initiative
petition or report of revision commission, constitutional convention or taxation and budget reform
commission proposing it is filed with the custodian of state records, unless, pursuant to law enacted
by the affirmative vote of three-fourths of the membership of each house of the legislature and
limited to a single amendment or revision, it is submitted at an earlier special election held more than
ninety days after such filing.
(b) A proposed amendment or revision of this constitution, or any part of it, by initiative shall be
submitted to the electors at the general election provided the initiative petition is filed with the
custodian of state records no later than February 1 of the year in which the general election is held.
(c)(b) The legislature shall provide by general law, prior to the holding of an election pursuant to this
section, for the provision of a statement to the public regarding the probable financial impact of any
amendment proposed by initiative pursuant to section 3.
(d)(c) Once in the tenth week, and once in the sixth week immediately preceding the week in which
the election is held, the proposed amendment or revision, with notice of the date of election at which
it will be submitted to the electors, shall be published in one newspaper of general circulation in each
county in which a newspaper is published.
(e)(d) If the proposed amendment or revision is approved by vote of the electors, it shall be effective
as an amendment to or revision of the constitution of the state on the first Tuesday after the first
Monday in January following the election, or on such other date as may be specified in the
amendment or revision.

## Amendment 3

Section 1. Article I, Section 26 is created to read "Claimant's right to fair compensation." In any
medical liability claim involving a contingency fee, the claimant is entitled to receive no less than
70% of the first $250,000.00 in all damages received by the claimant, exclusive of reasonable and
customary costs, whether received by judgment, settlement, or otherwise, and regardless of the
number of defendants. The claimant is entitled to 90% of all damages in excess of $250,000.00,
exclusive of reasonable and customary costs and regardless of the number of defendants. This
provision is self-executing and does not require implementing legislation.

Section 2. This Amendment shall take effect on the day following approval by the voters.

*void, "sham"* **Amendment 4** *UNConstitutional*

Article X, Florida Constitution, is hereby amended to add the following as section 19:

SECTION 19. SLOT MACHINES - *Without Subject Matter Jurisdiction Amendment*
(a) After voter approval of this constitutional amendment, the governing bodies of Miami-Dade and
Broward Counties each may hold a county-wide referendum in their respective counties on whether
to authorize slot machines within existing, licensed parimutuel facilities (thoroughbred and harness
racing, greyhound racing, and jai-alai) that have conducted live racing or games in that county during

*USED to Rig CASINO Gambling LICENSES*

each of the last two calendar years before the effective date of this amendment. If the voters of such county approve the referendum question by majority vote, slot machines shall be authorized in such parimutuel facilities. If the voters of such county by majority vote disapprove the referendum question, slot machines shall not be so authorized, and the question shall not be presented in another referendum in that county for at least two years.

*MAKE PAY OFF to CHARLIE CRIST*

(b) In the next regular Legislative session occurring after voter approval of this constitutional amendment, the Legislature shall adopt legislation implementing this section and having an effective date no later than July 1 of the year following voter approval of this amendment. Such legislation shall authorize agency rules for implementation, and may include provisions for the licensure and regulation of slot machines. The Legislature may tax slot machine revenues, and any such taxes must supplement public education funding statewide.

*Amend 5, 14*

(c) If any part of this section is held invalid for any reason, the remaining portion or portions shall be severed from the invalid portion and given the fullest possible force and effect.

*NOT SUPREME OVER TREATY OF 1819,*

(d) This amendment shall become effective when approved by vote of the electors of the state.

*RATIFIED 1821 SPANISH COMMON LAW*

*A "Conduit" "Scheme" For Honest Services*

## Amendment 5

SECTION X. Florida Minimum Wage Amendment *FRAUD, Flipping of*

(a) Public Policy. All working Floridians are entitled to be paid a minimum wage that is sufficient to provide a decent and healthy life for them and their families, that protects their employers from unfair low-wage competition, and that does not force them to rely on taxpayer-funded public services in order to avoid economic hardship. *LAND BY NICK GUTIERREZ JR*

(b) Definitions. As used in this amendment, the terms "Employer," "Employee" and "Wage" shall have the meanings established under the federal Fair Labor Standards Act (FLSA) and its implementing regulations. *RON McRAE    CHARLIE CRIST*

(c) Minimum Wage. Employerss shall pay Employees Wages no less than the Minimum Wage for all hours worked in Florida. Six months after enactment, the Minimum Wage shall be established at an hourly rate of $6.15. On September 30th of that year and on each following September 30th, the state Agency for Workforce Innovation shall calculate an adjusted Minimum Wage rate by increasing the current Minimum Wage rate by the rate of inflation during the twelve months prior to each September 1st using the consumer price index for urban wage earners and clerical workers, CPI-W, or a successor index as calculated by the United States Department of Labor. Each adjusted Minimum Wage rate calculated shall be published and take effect on the following January 1st. For tipped Employees meeting eligibility requirements for the tip credit under the FLSA, Employers may credit towards satisfaction of the Minimum Wage tips up to the amount of the allowable FLSA tip credit in 2003. *FOR SELF PROFIT, RIGGING*

(d) Retaliation Prohibited. It shall be unlawful for an Employer or any other party to discriminate in any manner or take adverse action against any person in retaliation for exercising rights protected under this amendment. Rights protected under this amendment include, but are not limited to, the right to file a complaint or inform any person about any party's alleged noncompliance with this amendment, and the right to inform any person of his or her potential rights under this amendment and to assist him or her in asserting such rights.

*INTERSTATE COMMERCE*

ISLE OF CAPRI CASINOS INC - ISLE Annual Report (10-K) ITEM 1. BUSINESS.

Case 1:07-cv-02096-RMC    Document 1-2    Filed 11/15/2007    Page 46 of 66

http://sec.edgar-online.com/2006/07/14/0000863015-06-500006

*[Handwritten notes: "HENRY M FLAGLER did NOT PAY 50% TO CHARLIE" "WSMS Void Statute"]*

Natchez, Mississippi; Kansas City and Boonville, Missouri; and Bettendorf, Davenport and Marquette, Iowa. We also own a 57% interest in, and receive management fees for operating, two gaming facilities in Black Hawk, Colorado. One of these facilities in Black Hawk, Colorado operates under the name "Isle of Capri" and features our distinctive tropical island theme. Our international gaming interests include a wholly owned casino in Freeport, Grand Bahama, and a two-thirds ownership interest in casinos in Dudley, Wolverhampton, and Walsall, England. We also wholly own and operate a pari-mutuel harness racing facility in Pompano Beach, Florida.

On May 11, 2005, we announced that the Iowa Racing and Gaming Commission awarded us a gaming license in Waterloo, Iowa. Construction is underway on a 35,000 square foot single level casino with 1,300 gaming positions, three restaurants, a 200-room hotel and 1,000 parking spaces. We expect to open in late spring of 2007 at a total cost of approximately $135 million.

On January 4, 2006, a Florida statute became effective allowing Pompano Park and three other pari-mutuel facilities in Broward County to offer slot machine gaming to patrons at these facilities. Although there are pari-mutuel facilities in numerous other counties in the State of Florida, slot machine gaming is only authorized in Broward County where Pompano Park is located. We are constructing a gaming facility including 1,500 slot machines, four restaurants and a feature bar at Pompano Park adjacent to the existing grandstand at a cost approximately $140 million with slot machine gaming anticipated to commence in early calendar year 2007. We do not plan to open a temporary gaming facility. The statute authorizes us to operate up to 1,500 slot machines at Pompano Park 365 days per year, 16 hours per day and requires Pompano Park to pay an annual license fee of $3.0 million and gaming taxes equal to 50% of Pompano Park's net slot machine revenue plus combined county and city taxes of approximately an additional 3.5% on the first $250 million of net slot machine revenue and 5% on net slot machine revenue over $250 million. The Florida Department of Business and Professional Regulation is administering the law and is now implementing rules and regulations for the operation of the slot machines.

On February 14, 2006, we announced the execution of an agreement to sell our properties in Bossier City, Louisiana and Vicksburg, Mississippi to Legends Gaming, LLC for $240 million. We expect to use proceeds from the sale to fund

HOME PAGE   MY TIMES   TODAY'S PAPER   VIDEO   MOST POPULAR   TIMES TOPICS

Free 14-Day Trial

The New York Times

Saturday, September 15, 2007

# Archives

WORLD   U.S.   N.Y. / REGION   BUSINESS   TECHNOLOGY   SCIENCE   HEALTH   SPORTS   OPINION   ARTS   STYLE   TRAVEL   JOBS   REAL EST

# National News Briefs; Louisiana Ex-Governor Is Indicted Again

Published: September 25, 1999

PRINT

SAVE

SHARE

Former Gov. Edwin W. Edwards and the state insurance commissioner were indicted today by a Federal grand jury on charges stemming from the 1993 failure of an insurance company.

The indictment charges that Mr. Edwards, the commissioner, James H. Brown Jr., and four other people "corrupted the office of the Louisiana insurance commissioner and the state judicial system" to benefit David Disiere, the operator of the Cascade Insurance Company.

The inquiry is the second part of an investigation of Mr. Edwards that produced Federal indictments in November when he and five others were accused of rigging the riverboat casino licensing process. Mr. Edwards has pleaded not guilty.

*[handwritten annotations:]*

License
Process
Rigged by
Illegal device
of WSMI
Void statute.

License
is not

Necessary
under treaty
of 1819, Spanish
Common Law

License Process
Rigged by Charlie
Crist for self profit

orange terra-cotta
me, adding a final
n.

e de Leon was only
ions and alterations
the way from the
e Alcazar, a smaller
commodations for
r also contained an
the rear there was
. The Casino con-
ral types of thera-
bowling alley and
re and Hastings'
a fitting comple-

of the moment by
rdova Street from
t medieval Moor-
he Ponce de Leon
side was a large,
winter chills were
he hotel, however,
old out to Flagler,
added it to his

which were, after
ler purchased the
he St. Johns River
nect with the rail
ld step out of the
Pullman "palace"
e warm sunshine
oad station in St.
spring overnight
north and set the

hotels in brightly





The Spanish Renaissance Hotel Ponce de Leon (top) was the first
built by Henry M. Flagler, opening in 1888. A year later, across King
Street, the Alcazar (lower right) welcomed guests. The Cordova, of
Moorish _architecture (lower left) completed the luxurious
triumvirate.

How HENRY M. FLAGLER
did iT

*[handwritten: INDIANS PAY NO IRS TAXES BY TREATY 1794 THAT INCLUDES PEOPLE OF EVERY]*

Treaty, that is to say; His Brittanick Majesty has named for His Plenipotentiary, *[handwritten: deGREE]* The Right Honourable William Wyndham Baron Grenville of Wotton, One of His Majesty's Privy Council, and His Majesty's Principal Secretary of State for Foreign Affairs; and The President of the said United States, by and with the advice and Consent of the Senate thereof, hath appointed for Their Plenipotentiary The Honourable John Jay, Chief Justice of the said United States and Their Envoy Extraordinary to His Majesty, who have agreed on, and concluded the following Articles

**ARTICLE 1.** *[handwritten: FIRST 10 ARTICLES SHALL BE PERMANENT TREATY RATIFIED SUPREME LAW UNDER ARTICLE III]*

There shall be a firm inviolable and universal Peace, and a true and sincere Friendship between His Britannick Majesty, His Heirs and Successors, and the United States of America; and between their respective Countries, Territories, Cities, Towns and People of every Degree, without Exception of Persons or Places.

**ARTICLE 2.** *[handwritten: NO ZONING BOUNDARY 60's TO FOR INDIANS EAST FLORIDA under TREATY EXISTS OF 1783 1794]*

His Majesty will withdraw all His Troops and Garrisons from all Posts and Places within the Boundary Lines assigned by the **Treaty of Peace** to the United States: This Evacuation shall take place on or before the first Day of June One thousand seven hundred and ninety six, and all the proper Measures shall in the interval be taken by concert between the Government of the United States, and His Majesty's Governor General in America, for settling the previous arrangements which may be necessary respecting the delivery of the said Posts: The United States in the mean Time at Their discretion extending their settlements to any part within the said boundary line, except within the precincts or Jurisdiction of any of the said Posts. All Settlers and Traders, within the Precincts or Jurisdiction of the said Posts, shall continue to enjoy, unmolested, all their property of every kind, and shall be protected therein. They shall be at full liberty to remain there, or to remove with all or any part of their Effects; and it shall also be free to them to sell their Lands, Houses, or Effects, or to retain the property thereof, at their discretion; such of them as shall continue to reside within the said Boundary Lines shall not be compelled to become Citizens of the United States, or to take any Oath of allegiance to the Government thereof, but they shall be at full liberty so to do, if they think proper, and they shall make and declare their Election within one year after the Evacuation aforesaid. And all persons who shall continue there after the expiration of the said year, without having declared their intention of remaining Subjects of His Britannick Majesty, shall be considered as having elected to become Citizens of the United States.

*[handwritten: UNMOLESTED USE + CASINO GAMBLING CONTRACT]*

ART. II—EXECUTIVE DEPARTMENT                    473

rency for the payment of debts and to confound creditors who
would not accept the currency provided that Virginia citizens could
pay into the state treasury debts owed by them to subjects of Great
Britain, which money was to be used to prosecute the war, and
that the auditor would give the debtor a certificate of payment
which would discharge the debtor of all future obligations to the
creditor.[274] The Virginia scheme directly contradicted the assur-
ances in the peace treaty that no bars to collection by British credi-
tors would be raised, and in *Ware v. Hylton*[275] the Court struck
down the state law as violative of the treaty that Article VI, para-
graph 2, made superior. Said Justice Chase: "A treaty cannot be
the *Supreme law* of the land, that is of all the *United States*, if any
act of a *State Legislature* can stand in its way. If the constitution
of a State . . . must give way to a treaty, and fall before it; can
it be questioned, whether the *less* power, an act of the state legisla-
ture, must not be prostrate? It is the declared will of *the people* of
the *United States* that every treaty made, by the authority of the
*United States* shall be superior to the *Constitution* and *laws* of *any
individual State*; and their will alone is to decide."[276]

In *Hopkirk v. Bell*,[277] the Court further held that this same
treaty provision prevented the operation of a Virginia statute of
limitation to bar collection of antecedent debts. In numerous subse-
quent cases, the Court invariably ruled that treaty provisions su-
perseded inconsistent state laws governing the right of aliens to in-
herit real estate.[278] Such a case was *Hauenstein v. Lynham*,[279] in
which the Court upheld the right of a citizen of the Swiss Republic,
under the treaty of 1850 with that country, to recover the estate
of a relative dying intestate in Virginia, to sell the same, and to
export the proceeds of the sale.[280]

---

[274] 9 W. HENING, STATUTES OF VIRGINIA (Richmond: 1821), 377–380.

[275] 3 Dall. (3 U.S.) 199 (1796).

[276] Id., 236–237 (emphasis by Court).

[277] 3 Cr. (7 U.S.) 454 (1806).

[278] See the discussion and cases cited in Hauenstein v. Lynham, 100 U.S. 483,
489–490 (1880).

[279] 100 U.S. 483 (1880). In Kolovrat v. Oregon, 366 U.S. 187, 197–198 (1961),
the International Monetary Fund (Bretton Woods) Agreement of 1945, to which the
United States and Yugoslavia were parties, and an Agreement of 1948 between
these two nations, coupled with continued American observance of an 1881 treaty
granting reciprocal rights of inheritance to Yugoslavian and American nations, were
held to preclude Oregon from denying Yugoslavian aliens their treaty rights because
of a fear that Yugoslavian currency laws implementing such Agreements prevented
American nationals from withdrawing the proceeds from the sale of property inher-
ited in the latter country.

[280] See also Geofroy v. Riggs, 133 U.S. 258 (1890); Sullivan v. Kidd, 254 U.S.
433 (1921); Nielsen v. Johnson, 279 U.S. 47 (1929); Kolovrat v. Oregon, 366 U.S.
187 (1961). But a right under treaty to acquire and dispose of property does not ex-
cept aliens from the operation of a state statute prohibiting conveyances of home-

there are a few cases which hold to the contrary.[17] But, whether it applies to acts of the territorial government is a more difficult question. It has been held that the territories of Missouri and Kansas had no right to impair the obligations of contracts.[18] Of course, the provision has no application to foreign governments, and effect must be given to their laws in the enforcement of contracts in this jurisdiction which are governed by foreign laws, even though such laws impair the obligations of contracts,[19] but it is well settled that it does apply to municipal corporations which are mere agencies or arms of the state government.[20]

**§ 2717. Laws affected by this constitutional provision.** —The clause of the federal constitution forbidding any state to pass any law impairing the obligation of contracts embraces acts of the state legislature,[21] and also applies to city ordinances[22] when such ordinances are enacted by authority of the state.[23] And orders and resolutions of a city

ed. 657; Herman v. Phalen, 14 How. (U. S.) 79, 14 L. ed. 334.
[17] Territory v. Reyburn, McCahon (Kans.) 134, 1 Kans. (Dass. Ed.) 551; Baird v. United States, Dev. Ct. Cl. (U. S.) 89, § 333.
[18] Morton v. Sharkey, 1 Kans. 535 (Dass. ed.), McCahon (Kans.) 113; Ruggles v. Washington County, 3 Mo. 496.
[19] Canada Southern R. Co. v. Gebhard, 109 U. S. 527, 27 L. ed. 1020, 3 Sup. Ct. 363.
[20] Iron Mountain R. Co. v. Memphis, 96 Fed. 113, 37 C. C. A. 410; Mercantile Trust & Deposit Co. v. Collins Park & B. R. Co., 99 Fed. 812; Southwest Missouri Light Co. v. Joplin, 101 Fed. 23; Grand Trunk &c. R. Co. v. South Bend (U. S.), 33 Sup. Ct. 303, and numerous cases there cited in the opinion; Neill v. Gates, 152 Mo. 585, 54 S. W. 460.
[21] Louisiana v. Pilsbury, 105 U. S. 278, 26 L. ed. 1090; Chicago Ins. Co. v. Needles, 113 U. S. 574, 28 L. ed. 1084, 5 Sup. Ct. 681; Mobile, O. R. Co. v. Tennessee, 153 U. S. 486, 38 L. ed. 793, 14 Sup. Ct. 968; Beers v. Haughton, 1 McLean (U. S.) 226,

Fed. Cas. No. 1230; National Bank of Western Arkansas v. Sebastian County, 5 Dill. (U. S.) 414, Fed. Cas. No. 10040. The Workmen's Compensation Law of New York was held not authorized by the reserved power of the state to amend or alter corporate charters. Ives v. South Buffalo R. Co., 201 N. Y. 271, 94 N. E. 431, 34 L. R. A. (N. S.) 162n, affg. 140 App. Div. (N. Y.) 921, 125 N. Y. S. 1125, affg. 68 Misc. (N. Y.) 643, 124 N. Y. S. 920.
[22] Iron Mountain R. Co. v. Memphis, 96 Fed. 113, 37 C. C. A. 410; Mercantile Trust & Deposit Co. v. Collins Park & B. R. Co., 99 Fed. 812; Southwest Missouri Light Co. v. Joplin, 101 Fed. 23; Cumberland Tel. & T. Co. v. Memphis, 198 Fed. 955; Neill v. Gates, 152 Mo. 585, 54 S. W. 460; Penn Mut. Life Ins. Co. v. Austin, 168 U. S. 685, 42 L. ed. 626, 18 Sup. Ct. 223. Ordinances of a city are laws of the state within the meaning of this provision of the Constitution. See also, Grand &c. R. Co. v. South Bend (U. S.), 33 Sup. Ct. 303 and cases cited.
[23] And if a contract is alleged to

879

council stitutic A stat federal pairing parity law wi tion.[28] tions u the Ur such cc stitutio federal

§ 271 provisi impaire tage of

have bee nance, it authority granted ( or, if gr that it w American catur, 176 does not c through come witl tion agair tracts, un acted by and Con United R 190 Fed.
[26] Minne apolis, 18
[27] Oakla Cal. 45, 2 93 Cal. 1 Continent (Pa.) 36. v. Wood Nelson v. 781, 11 S Delmas v Wall. (U. Pacific R (U. S.)

NO ZONING CAN EVER EXIST By Void, WSMT Judges ORDER

CHAP. XXXIX.—*An Act for carrying into execution the treaty between the United States and Spain, concluded at Washington on the twenty-second day of February, one thousand eight hundred and nineteen.* (a)

Statute II. March 3, 1821.

*Be it enacted by the Senate and House of Representatives of the United States of America, in Congress assembled,* That the President of the

President authorized to take possession of

(a) See note to act of Mar. 3, 1819, ch. 93, for the acts passed relating to the territory of Florida.

The decisions of the Supreme Court upon the treaty between the United States and Spain of 22d of February, 1819, by which Florida was ceded to the United States, and upon the act of March 3, 1821, have been:

By the stipulations of a treaty, are to be understood its language and apparent intentions, manifested in the instrument; with a reference to the contracting parties, the subject matter and persons on whom it is to operate. United States v. Arredondo et al., 6 Peters, 710.

The judiciary is not that department of the government to which the assertion of its interest against foreign powers is confided; and its duty, commonly, is to decide upon individual rights according to those principles which the political departments of the nation have established. If the course of the nation has been a plain one, its courts would hesitate to pronounce it erroneous. However individual judges might construe the treaty of St. Ildefonso, it is the province of the Supreme Court of the United States to conform its decisions to the will of the legislature, if that will has been clearly expressed. Foster and Elam v. Neilson, 2 Peters, 307. United States v. Arredondo, 6 Peters, 710.

A treaty of cession is a deed of the ceded territory; the sovereign is the grantor, and the act is his; so far as relates to the cession the treaty is his act and deed, and all courts must so consider it; and deeds are construed in equity by the rules of law. Ibid. 738.

The Spanish version of the Florida treaty was in the words of the king, and expressed his intention; and though the American version showed the intention of the American government to be different, the Supreme Court cannot adopt it to decide what was granted by the king of Spain, what accepted and what reserved: the rules of law are too imperative to be disregarded or mistaken. The true interpretation of the Spanish language of the treaty is, that the grants of lands in Florida, made before the treaty, except those specially excepted, is that these grants remain confirmed.—The proprietors of such grants could bring suits to recover them without any action of Congress; and any question arising would be purely a judicial question. Ibid. 741.

The object of the treaty with Spain, which ceded Florida to the United States, dated 22d May, 1819, was to invest the commissioners with full power and authority to receive, examine, and decide upon the amount and validity of asserted claims upon Spain, for damages and injuries. Their decision, within the scope of this authority, is conclusive and final, and is not re-examinable. The parties must abide by it, as the decree of a competent tribunal of exclusive jurisdiction. A rejected claim cannot be brought again under review in any judicial tribunal. But it does not necessarily follow that this authority extends to adjust all conflicting rights, of different claimants, to the fund so awarded. The commissioners are to look to the original claim for damages and injuries against Spain itself, and it is wholly immaterial, who is the legal or equitable owner of the claim, provided he is an American citizen. Comegys et al. v. Vasse, 1 Peters, 212.

After the validity and amount of the claim has been ascertained by the award of the commissioners, the rights of the claimant to the fund, which has passed into his hands and those of others, are left to the ordinary course of judicial proceedings, in the established courts of justice. Ibid. 212.

The treaty with Spain recognised an existing right in the aggrieved parties to compensation; and did not, in the most remote degree, turn upon the notion of donation or gratuity. It was demanded by our government as matter of right, and as such was granted by Spain. Ibid. 212.

Even in cases of conquest, it is very unusual for the conqueror to do more than to displace the sovereign and assume dominion over the country. The modern usage of nations, which has become law, would be violated; that sense of justice and of right, which is acknowledged and felt by the whole civilized world, would be outraged, if private property should be generally confiscated, and private rights annulled on a change in the sovereignty of the country, by the Florida treaty. The people change their allegiance, their relation to their ancient sovereign is dissolved; but their relations to each other and their rights of property remain undisturbed. Had Florida changed its sovereign by an act containing no stipulation respecting the property of individuals, the right of property in all those who became subjects or citizens of the new government would have been unaffected by the change. It would have remained the same as under the ancient sovereign. United States v. Percheman, 7 Peters, 51.

The language of the second article of the treaty between the United States and Spain, of 22d February, 1819, by which Florida was ceded to the United States, conforms to this general principle. Ibid.

The eighth article of the treaty must be intended to stipulate expressly for the security to private property, which the laws and usages of nations would, without express stipulation, have conferred. No construction which would impair that security, further than its positive words require, would seem to be admissible. Without it, the titles of individuals would remain as valid under the new government as they were under the old. And those titles, so far at least as they were consummated, might be asserted in the courts of the United States, independently of this article. Ibid.

The treaty was drawn up in the Spanish as well as in the English languages. Both are original, and were unquestionably intended by the parties to be identical. The Spanish has been translated; and it is now understood that the article expressed in that language is, that "the grants shall remain ratified and confirmed to the persons in possession of them, to the same extent," &c.; thus conforming exactly to the universally received law of nations. Ibid.

If the English and Spanish part can, without violence, be made to agree, that construction which establishes this conformity ought to prevail. Ibid.

No violence is done to the language of the treaty by construction which conforms the English and Spanish to each other. Although the words "shall be ratified and confirmed," are properly words of

TREATY 1819 RATIFIED

TREATY 1821

CASINO GAMBLING + UNRESTRICTED USE OF PROPERTY

SPANISH LAW IS THE COMMON LAW OF FLORIDA PROPERTY 7 PETERS 51

**NS.**

of the United States) to the enjoyment of all the rights of citizens of the United States, according to the principles of the Constitution; and in the mean time, shall be maintained and protected in the free enjoyment of their liberty and property, and secured in the free exercise of their religion without restriction.

greement regarding its for the use and advan-

*[handwritten: TREATY 1803]*
*[handwritten: TREATY 1821]*
*[handwritten: TREATY 1853]*

ARTICLE X.

[Stricken out.]

ARTICLE XI.

*[handwritten: TREATY 1848]*
*[handwritten: TREATY 1794]*

del Norte lying below ico, being, agreeably to le between the two re- nd of the Bravo below vessels and citizens of nsent of the other, con- n whole or in part, the favouring new methods , under any denomina- or persons navigating ts transported thereon, ne of their shores. If rivers navigable, or for sbould be necessary or , this shall not be done

Considering that a great part of the territories, which, by the present treaty, are to be comprehended for the future within the limits of the United States, is now occupied by savage tribes, who will hereafter be under the exclusive control of the Government of the United States, and whose incursions within the territory of Mexico would be prejudicial in the extreme, it is solemnly agreed that all such incursions shall be forcibly restrained by the Govern- ment of the United States whensoever this may be necessary; and that when they cannot be prevented, they shall be punished by the said government, and satisfaction for the same shall be exacted—all in the same way, and with equal diligence and energy, as if the same incur- sions were meditated or committed within its own territory, against its own citizens.

le shall not impair the blished limits.

eviously belonging to ature within the limits he present treaty, shall reside, or to remove at e property which they eof, and removing the ing subjected, on this ever.

It shall not be lawful, under any pretext whatever, for any inhabitant of the United States to purchase or acquire any Mexican, or any foreigner residing in Mexico, who may have been captured by Indians inhabiting the territory of either of the two republics; nor to purchase or acquire horses, mules, cattle, or property of any kind, stolen within Mexican territory by such Indians.

territories may either r acquire those of citi- nder the obligation to te of the exchange of remain in the said ter having declared their hall be considered to tes.

nd, now belonging to be inviolably respect- f these, and all Mexi- contract, shall enjoy the same belonged to

And in the event of any person or persons, captured within Mexican territory by Indians, being carried into the territory of the United States, the Government of the latter engages and binds itself, in the most solemn manner, so soon as it shall know of such captives being within its territory, and shall be able so to do, through the faithful exercise of its influence and power, to rescue them and return them to their country, or deliver them to the agent or representative of the Mexican Government. The Mexican authorities will, as far as practicable, give to the Government of the United States notice of such captures; and its agents shall pay the expenses incurred in the maintenance and transmission of the rescued captives; who, in the mean time, shall be treated with the utmost hos- pitality by the American authorities at the place where they may be. But if the Government of the United States, before receiving such notice from Mexico, should obtain intelligence, through any other channel, of the existence of Mexican captives within its territory, it will proceed forthwith to effect their release and delivery to the Mexican agent, as above stipulated.

shall not preserve the tepublic, conformably ng article, shall be in- nited States, and be ed of by the Congress

For the purpose of giving to these stipulations the fullest possible efficacy, thereby affording the security and redress demand- ed by their true spirit and intent, the Government of the United States will now and hereafter pass, without unneces- sary delay, and always vigilantly enforce, such laws as the nature of the subject may require. And, finally, the sacredness of this obligation shall never be lost sight of by the said Government, when pro-

*[handwritten: UNRESTRICTED USE + CASINO GAMBLING]* *[handwritten: TREATY 1848 CONTRACT]*

PLAINTIFF, GEORGE MAY

ADDENDUM

"C"

US Attorneys > USAM > Title 9 > Criminal Resource Manual

prev | next

# 774 Defenses -- Violation of an Invalid Decree

A decree which has been erroneously rendered must nonetheless be obeyed until overturned, and violators thereof may be punished for criminal contempt. *United States v. United Mine Workers of America*, 330 U.S. 258, 293 (1947); *United States v. J. Myer Schine*, F.2d 552, 557 (2nd Cir. 1959), *cert. denied*, 358 U.S. 934 (1959). A possible exception exists where the order is "transparently" unlawful. *Walker v. City of Birmingham*, 388 U.S. 307, 315 (1967). *See also Maness v. Meyers*, 419 U.S. 449 (1975) (lawyer may not be held in contempt for good faith advice to client to invoke Fifth Amendment).

A contempt proceeding does not open to reconsideration the legal or factual basis of the underlying order; the proceeding is not retrial of the original controversy. *See Maggio v. Zietz*, 333 U.S. 56, 69 (1948); *United States v. First State Bank*, 691 F.2d 332 (7th Cir. 1982). Thus, an issue that could have been raised when the decree was entered cannot be raised for the first time in a contempt proceeding. *See generally, United States v. Rylander*, 460 U.S. 752 (1983).

October 1997

**Criminal Resource Manual 774**

07 2096

# FILED

NOV 1 5 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

nited States, Walker v. City of Birmingham

http://www.hrcr.org/safrica/expression/walker_birmin

MR. JUSTICE DOUGLAS, with whom THE CHIEF JUSTICE, MR. JUSTICE BRENNAN, and MR. JUSTICE FORTAS concur, dissenting.

We sit as a court of law functioning primarily as a referee in the federal system. Our function in cases coming to us from state courts is to make sure that state tribunals and agencies work within the limits of the Constitution. Since the Alabama courts have flouted the First Amendment, I would reverse the judgment.

The right to defy an unconstitutional statute is basic in our scheme. Even when an ordinance requires a permit to make a speech, to deliver a sermon, to picket, to parade, or to assemble, it need not be honored when it is invalid on its face. Lovell v. Griffin, 303 U.S. 444, 452-453; Thornhill v. Alabama, 310 U.S. 88, 97; Jones v. Opelika, 316 U.S. 584, 602, adopted per curiam on rehearing, 319 U.S. 103, 104; Cantwell v. Connecticut, 310 U.S. 296, 305-306; Thomas v. Collins, 323 U.S. 516; Staub v. City of Baxley, 355 U.S. 313, 319.

By like reason, where a permit has been arbitrarily denied, one need not pursue the long and expensive route to this Court to obtain a remedy. The reason is the same in both cases. For if a person must pursue his judicial remedy before he may speak, parade, or assemble, the occasion when protest is desired or needed will have become history and any later speech, parade, or assembly will be futile or pointless.

It is clear that there are no published rules or regulations governing the manner of applying for permits, and it is clear from the record that some permits are issued. One who reads this record will have, I think, the abiding conviction that these people were denied a permit solely because their skin was not of the right color and their cause was not popular.

A court does not have jurisdiction to do what a city or other agency of a State lacks jurisdiction to do. The command of the Fourteenth Amendment, through which the First Amendment is made applicable to the States, is that no "State" shall deprive any person of "liberty" without due process of law. The decree of a state court is "state" action in the constitutional sense (Shelley v. Kraemer, 334 U.S. 1, 14-18), as much as the action of the state police, the state prosecutor, the state legislature, or the Governor himself. An ordinance -- unconstitutional on its face or patently unconstitutional as applied -- is not made sacred by an unconstitutional injunction that enforces it. It can and should be flouted in the manner of the ordinance itself. Courts as well as citizens are not free "to ignore all the procedures of the law," to use the Court's language. The "constitutional freedom" of which the Court speaks can be won only if judges honor the Constitution.

MR. JUSTICE BRENNAN, with whom THE CHIEF JUSTICE, MR. JUSTICE DOUGLAS, and MR. JUSTICE FORTAS join, dissenting.

"THE DEFENDANT'S HERE ARE USING A VOID, WITHOUT
SUBJECT MATTER JURISDICTION, UNCONSTITUTIONAL
CONTEMPT OF COURT ORDER, ORDER FOR ARREST AS A
UNLAWFUL "DEVICE" TO NOT PAY ON THEIR CONTRACT,
AND TO ROB MY INVENTIONS, TRADE SECRETS WHICH
THEY ARE USING AND HAVE AGREED TO PAY FOR"

"A FEDERAL COURT ORDER PROHIBITING THE USE OF THEIR
VOID, UNCONSTITUTIONAL, WITHOUT SUBJECT MATTER
JURISDICTION "DEVICE" USED FOR THEIR ROBBERY, AND
ORDER, ORDERING THE LOWER COURT TO ISSUE A DEFAULT
JUDGEMENT FOR GEORGE MAY, AND HIS ATTORNEY'S IS
REQUIRED BY LAW, THE UNITED STATES OF AMERICA
CONSTITUTION AMENDMENT ONE, FOUR, FIVE, FOURTEEN,
THE BILL OF RIGHTS.



THE STEIN LAW FIRM

June 12, 2007

Hon. Elizabeth T. Maas
Circuit Judge
Palm Beach County Courthouse
401 North Dixie Highway
West Palm Beach, FL 33401

Re:    *George May v. Patrick C. Barthet, et al.*
       Case No. 502004CA004938XXXXMB
       Hon. Elizabeth T. Maas

Dear Judge Maas:

Enclosed with this letter is a courtesy copy of the Motion to Set Aside Judgment of Guilt and Order of Arrest filed with the Clerk on January 20, 2005. The original was sent directly to the Clerk.

It is assumed that the court will set a hearing on this matter. It is respectfully requested that the hearing be set towards the end of July or in early August after responses, if any, from the other parties and/or their attorneys in the action. One would suspect that opposition to the Motion would be served to reach all parties no later than July 9, 2007.

This office would contact your Chambers after July 9, 2007 to set a time certain hearing after contact with other counsel who appear to coordinate as to dates where counsel is unavailable.

Should your judicial assistant need to reach this office should Your Honor want to handle this differently, please note that the office is closed on Fridays.

Yours very truly,
THE STEIN LAW FIRM

by _____
       Stuart L. Stein

cc:    All Counsel of Record

IN THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY,
STATE OF FLORIDA

CASE NO. 502004CA004938XXXXMB
Hon. Elizabeth T. Maass

GEORGE MAY,

     Plaintiff,

vs.

PATRICK C. BARTHET, ANDREW M.
FELDMAN, MICHAEL K. WINSTON,
JOHN R. HART, PAUL D. BREITNER,
GLENN SCHAEFFER, MICHAEL ENSIGN,
MANDALAY RESORTS GROUP, INC.,
INTERNATIONAL GAME TECHNOLOGY,
INC., G. THOMAS BAKER, CHARLES N.
MATHEWSON,

     Defendants.

_____

STATE OF FLORIDA,

     Plaintiff,

vs.

GEORGE MAY,

     Defendant.

_____/

## MOTION TO SET ASIDE JUDGMENT OF GUILT
## AND ORDER OF ARREST

     **COMES NOW** the Plaintiff GEORGE MAY, by and through the undersigned

attorney, and moves the Court to set aside the January 19, 2005 Judgment of Guilt and Order

1

of Arrest, recorded with the Clerk of the Court on January 20, 2005, and in support thereof states as follows:

## INTRODUCTION

1. That this cause was filed *pro se* by Plaintiff GEORGE MAY without first obtaining leave of the administrative judge.

2. That the Court entered an Order of Dismissal With Prejudice, Directions to the Clerk and Prefiling Order Under Florida Statute §68.093 on July 14, 2004.

3. That the Court included the following language in its Order of July 14, 2004:

> ORDERED AND ADJUDGED that Plaintiff, George May, is prohibited from commencing pro se any new action in the courts of the 15th Judicial Circuit, State of Florida, including the County Court in and for Palm Beach County, Florida without first obtaining leave of the administrative judge for the circuit. Disobedience of this Order may be punished by contempt of court.

4. That after July 14, 2004 it is alleged that Plaintiff GEORGE MAY filed a *pro se* action under case number 502004CA008739XXXXMB without first obtaining leave of the administrative judge for the circuit in an Order to Show Cause (Indirect Criminal Contempt of Court) entered on October 5, 2004. The Order to Show cause was based on an unsworn letter from an attorney representing one of the defendants allegedly sued by George May. That the Order to Show Cause stated, in part, as follows:

> . . . *that it appears* that George May has filed a Complaint without first obtaining leave of the administrative judge of the circuit . . .

Emphasis supplied.

2

5. That no response on behalf of Plaintiff GEORGE MAY was made to the Order to Show Cause.

6. That ultimately in this file, a Judgment of Guilt and Order of Arrest was entered by the Court on January 19, 2005 and filed in this cause by the Clerk on January 20, 2005.

7. That the Judgment of Guilt and Order of Arrest was entered by the Court on January 19, 2005 and entered in the file by the Clerk on January 20, 2005 was incorrectly entered and should be set aside.

## ARGUMENT

## I - FATAL ERRORS IN ORDER TO SHOW CAUSE

That all indirect criminal contempts must follow Rule 3.840 of the Florida Rules of Criminal Procedure. As with all criminal matters, the operative facts of the indirect criminal contempt must be plead with particularity to meet the Due Process provisions of the Fifth and Fourteenth Amendments to the United States Constitution. Failure to follow the rule is fundamental error. *Baker v. Green*, 732 So.2d 6 (Fla. 4th DCA 1999). These proceedings did not follow Rule 3.840 in the following manner:

    **a. No Statement of Essential Facts.** This Rule requires that the Order to Show Cause contain words ". .. stating the essential facts constituting the criminal contempt charged . . . " Rule 3.840.(a). The Order to Show Cause fails to state essential facts. Although there is a reference to case number 502004CA008739XXXXMB, the operative words of the Order to Show Cause states that ". . . George May has filed *a* complaint . . . " which is not a direct

3

reference to one particular case.  Emphasis supplied.

**b. Statement that "it appears" is not an Essential Fact.**  The phrase in the Order to Show Cause that the court "noted that it appears" is not an essential fact.  What this court has "noted" or its subjective determination that something "appears" to the court is not an Essential Fact as required by Rule 3.840.  One is not charged with a criminal information or indictment that one is "noted" by another to have "appeared" to have committed a particular crime.  All allegations of crimes must be charged specifically to be tried objectively.  The question to be determined by the trier of fact is not what another "notes" as to what "appeared" to them but what the charged defendant actually did.  A contempt conviction without articulation of essential facts in the Order to Show Cause that is not cured by an accompanying sworn affidavit is void.  *Flanagan v. State*, 840 So.2d 3769 (1st DCA 2003).  *See, also, Cole v. State*, 714 So.2d 479 (2nd DCA 1998).

**c.  No Statement to Respond by Showing Action is Allowed Under Statute.**  The contempt sentence of F.S.A. § 68.093(4) is followed by the following statement: "Leave of court shall be granted by the administrative judge only upon a showing that the proposed action is meritorious and is not being filed for the purpose of delay or harassment."  Therefore, any Order to Show Cause must give notice to the intended vexatious litigant that they have the right to show that the filed case "is meritorious and is not being filed for the purpose of delay or harassment".  Failure to have this statement in the Order to Show Cause is

4

fatal to the proceeding and the Judgment of Guilt and Order of Arrest.

d. **Failure to Have Affidavit to Support Order to Show Cause.** As noted, above, it is fundamental error to not comply with F.R.Cr.P. Rule 3.840 in an indirect criminal contempt situation. *Baker v. Green*, 732 So.2d 6, 7 (Fla. 4th DCA 1999) and cases cited therein. This matter came to the court's attention after a letter was written to the court from counsel representing one of the Defendants who claimed to have been sued by Mr. May. The letter was unsworn. There was no sworn affidavit to support the Order to Show Cause. The fact that the Court subjectively determined it had all it needed before it after taking judicial notice of another file is of no moment: the affidavit was required.

e. **Failure to comply provisions of Rule 3.840.** It is error requiring reversal of requiring setting aside of Judgment of Guilt and Order of Arrest if the Order to Show cause did not comply with Rule 3.840. *Baker*, above, and *Van Hare v. Van Hare*, 870 So.2d 125 (4th DCA 2003).

## II - FATAL ERROR IN USING THIS CAUSE AS VEHICLE FOR CONTEMPT

The Florida Vexatious Litigant Law limits the remedies and sanctions concerning vexatious litigants who disobey orders entered under the statute. Under F.S.A. § 68.093.(4) any contempt - be it civil or criminal - is before the Administrative Judge of that Circuit. Clearly, the legislative intent was that the trial on the contempt of the litigant was to be held before the Administrative Judge - a judge different than the one initially entering the order under F.S.A. § 68.093.

A separate criminal case, a miscellaneous administrative case or civil case needed

5

to be filed on the criminal contempt matter. This was not done and it fatal to the jurisdiction of the court to enter the Order to Show Cause and the Judgment of Guilt and Order of Arrest. After dismissal with prejudice of the case by the Court on July 14, 2004, entered on the record on July 15, 2004, there was no jurisdiction for any matter. *Haft-Gaines Co. v. Reddick*, 350 So.2d 818 (4th DCA 1977).

WHEREFORE, Plaintiff GEORGE MAY prays that the Judgment of Guild and Order of Arrest entered on January 20, 2005 be set aside as having no force or effect.

I HEREBY CERTIFY that a true copy of the foregoing was mailed to Jack Ackerman, Assistant State Attorney, 401 North Dixie Highway, West Palm Beach, FL 33401; Michael K. Winston, Esq., 222 Lakeview Avenue, Suite 1400, Post Office Box 150, West Palm Beach, FL 33401; Paul D. Breitner, Esq., 200 S. Biscayne Blvd., Suite 1800, Miami, FL 33131; Palm Beach County Sheriff's Office, 3228 Gun Club Road, West Palm Beach, FL 33401 and Port St. Lucie Sheriff's Office, Civil Process Unit, 218 South Second Street, Room 133, Ft. Pierce, FL 34950 this 12th day of June, 2007.

THE STEIN LAW FIRM
Attorney for Plaintiff George May
City Place - Suite 2200
2155 Louisiana Blvd., N.E.
Albuquerque, NM 87110
Telephone: 505-889-0100
Facsimile: 505-889-0953

by _____
Stuart L. Stein
Fla Bar: 235563

c:\misc\pleading\may.001

IN THE FIFTEENTH JUDICIAL CIRCUIT IN
AND FOR PALM BEACH COUNTY,
FLORIDA

CASE NO. 502004CA004938XXXXMB

GEORGE MAY,
     Plaintiff(s),

vs.

PATRICK C. BARTHET, et al.,
     Defendant(s).



## ORDER ON PLAINTIFF'S MOTION TO CONTINUE AND PLAINTIFF'S MOTION TO SET ASIDE JUDGMENT OF GUILT AND ORDER OF ARREST

THIS CAUSE came before the Court August 17, 2007 on Plaintiff's Motion to Continue and Motion to Set Aside Judgment of Guilt and Order of Arrest, with Plaintiff's counsel participating by speaker telephone and Defendants' attorneys present. Based on the proceedings before the Court, it is

ORDERED AND ADJUDGED that Plaintiff's Motion to Continue is Denied. It is further

ORDERED AND ADJUDGED that Plaintiff's Motion to Set Aside Judgment of Guilt and Order of Arrest is Denied.

DONE AND ORDERED in West Palm Beach, Palm Beach County, Florida this 17th day of August, 2007.

ELIZABETH T. MAASS
Circuit Court Judge

copies furnished:
Stuart L. Stein, Esq.
City Place, Suite 2200
2155 Louisiana, NE
Albuquerque, NM 87110

Paul D. Breitner, Esq.
200 S. Biscayne Blvd., Suite 1800
Miami, FL 33131

John R. Hart, Esq.
222 Lakeview Ave., Suite 1400
P.O. Box 150
West Palm Beach, FL 33402

*VOID WSMJ ORDER BASED ON A VOID WSMJ ORDER BY A JUDGE AUTOMATICALLY RECUSED FOR DEALING IN EQUITY*

Carol Stafford Haughwout, Esq.
Public Defender's Office
421 3rd Street
West Palm Beach, FL 33401

Barry E. Krischer, Esq.
State Attorney's Office
401 N. Dixie Highway
West Palm Beach, FL 33401

Alfred J. Saikali, Esq.
100 SE 2nd Street, Suite 4000
Miami, FL 33131

Michael Winston, Esq.
222 Lakeview Ave., Suite 1400
P.O. Box 150
West Palm Beach, FL 33402

## CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| George May                          88888 | The State of Florida Et. al. |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF **Palm Bch.**
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT **Leon**
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

George May,  Ph. 305-508-5011
P.O. Box 32247
Palm Bch. Gardens
Fl. 33420

Case: 1:07-cv-02096
Assigned To : Collyer, Rosemary M.
Assign. Date : 11/15/2007
Description: Pro Se General Civil

| II. BASIS OF JURISDICTION | III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX |
|---|---|
| (PLACE AN x IN ONE BOX ONLY) | FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!** |

| | | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|---|
| ○ 1 U.S. Government Plaintiff | ⊗ 3 Federal Question (U.S. Government Not a Party) | Citizen of this State ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| ○ 2 U.S. Government Defendant | ○ 4 Diversity (Indicate Citizenship of Parties in item III) | Citizen of Another State ⊗ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ⊗ 5 |
| | | Citizen or Subject of a Foreign Country ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT

(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

| ○ A. *Antitrust* | ○ B. *Personal Injury/ Malpractice* | ○ C. *Administrative Agency Review* | ⊗ D. *Temporary Restraining Order/Preliminary Injunction* |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)* |

| ○ E. *General Civil (Other)* | OR | ⊗ F. *Pro Se General Civil* |
|---|---|---|

| **Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability | **Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609 | **Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation | ☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☒ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

(4) |

| ○ **G.** *Habeas Corpus/ 2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/PRIVACY ACT* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ **530 Habeas Corpus-General** <br> ☐ **510 Motion/Vacate Sentence** | ☐ **442 Civil Rights-Employment** (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation) <br><br> *(If pro se, select this deck)* | ☐ **895 Freedom of Information Act** <br> ☐ **890 Other Statutory Actions** (if Privacy Act) <br><br> *(If pro se, select this deck)* | ☐ **152 Recovery of Defaulted Student Loans** (excluding veterans) |

| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ **710 Fair Labor Standards Act** <br> ☐ **720 Labor/Mgmt. Relations** <br> ☐ **730 Labor/Mgmt. Reporting & Disclosure Act** <br> ☐ **740 Labor Railway Act** <br> ☐ **790 Other Labor Litigation** <br> ☐ **791 Empl. Ret. Inc. Security Act** | ☐ **441 Voting (if not Voting Rights Act)** <br> ☐ **443 Housing/Accommodations** <br> ☐ **444 Welfare** <br> ☐ **440 Other Civil Rights** <br> ☐ **445 American w/Disabilities-Employment** <br> ☐ **446 Americans w/Disabilities-Other** | ☐ **110 Insurance** <br> ☐ **120 Marine** <br> ☐ **130 Miller Act** <br> ☐ **140 Negotiable Instrument** <br> ☐ **150 Recovery of Overpayment & Enforcement of Judgment** <br> ☐ **153 Recovery of Overpayment of Veteran's Benefits** <br> ☐ **160 Stockholder's Suits** <br> ☐ **190 Other Contracts** <br> ☐ **195 Contract Product Liability** <br> ☐ **196 Franchise** | ☐ **441 Civil Rights-Voting** (if Voting Rights Act) |

**V. ORIGIN**

⊗ 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

*42 USC 1983*

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

Defendant's are violating plaintiff's Constitutional, Civil Rights.

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | **DEMAND $** 75,000.00 | Check YES only if demanded in complaint <br> **JURY DEMAND:** YES ☐ NO ☒ |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY** *p.p.*   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

DATE 11-2-07 / 15   SIGNATURE OF ATTORNEY OF RECORD

---

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

**I.**   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

**III.**   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

**IV.**   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

**VI.**   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

**VIII.**   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.